HOLIDAY INNS, INC., A Tennessee corporation, and Harrah's Atlantic City, Inc., a New Jersey corporation, Plaintiffs,

v.

Donald J. TRUMP, Defendant, Third-Party Plaintiff,

v.

HARRAH'S INC., Third-Party Defendant.

Civ. A. No. 85–2884.

United States District Court, D. New Jersey.

Sept. 23, 1985.

Laurence B. Orloff, Orloff, Lowenbach, Stifelman & Siegel, P.A., Roseland, N.J., and Joseph R. Sahid, Douglas D. Broadwater, Gerald A. Ford, Kenneth A. O'Brien, Jr., Cravath, Swaine & Moore, New York City, for plaintiffs and third-party defendant.

John J. Barry, David Samson, Gage Andretta, Kenneth N. Laptook, David J. Reich, Wolff & Samson, Roseland, N.J., for defendant and third-party plaintiff.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

BROTMAN, District Judge.

This action arises out of conflicts between the principals in a three-year-old partnership venture to build and operate the tenth casino hotel in Atlantic City, New Jersey. On June 30, 1982, plaintiff Harrah's Atlantic City, Inc. ("HAC"), a subsidiary of plaintiff Holiday Inns, Inc. ("HI"), entered into a partnership with Trump Plaza Corporation, whose sole shareholder is defendant Donald J. Trump. The agreement created "Harrah's Associates" ("the Partnership").

Through Harrah's Associates, plaintiffs and Trump ("the Partners") own and operate the "Trump Casino Hotel" on the Boardwalk in Atlantic City. The Partners' casino hotel, built by Trump and now managed by HAC, opened in May, 1984. Each of the Partners is the sole owner of another casino hotel in Atlantic City. These two other facilities, "Harrah's Marina" and "Trump's Castle Casino Hotel," are situated across the street from one another in the section of the city known as the Marina. "Harrah's Marina" has been in operation for several years. Defendant began operations of his new casino hotel in June, 1985, shortly after he purchased the facility from Hilton Hotel Corporation, which failed to receive an operating license from the New Jersey Casino Control Commission.

The present litigation stems from two sets of events which have caused a serious deterioration in relations between the Partners. HAC and Trump originally planned to develop a multi-level parking complex ("the Parking Facility") on land adjacent to their Boardwalk casino hotel. While the Partners have obtained the necessary properties, they have failed to agree upon terms for construction and operation of a garage. Plaintiffs fear defendant wishes to obstruct development of new parking accommodations. Plaintiffs also object to defendant's use of his last name in the promotion of his new casino hotel. According to plaintiffs, defendant's actions have caused public confusion between the two facilities whose titles contain the name "Trump." Such confusion has allegedly resulted in irreparable harm to the Partnership's casino hotel.

Plaintiffs filed suit on June 17, 1985. The Complaint asserts that defendant's re-

fusal to recognize plaintiffs' ownership interest in land designated for a new parking facility and his use of his name in connection with his new casino hotel both violate plaintiffs' rights under the Partnership Agreement. With respect to the issue of parking accommodations (Count 1), plaintiffs seek relief under New Jersey property and partnership law. As to defendant's use of his name, plaintiffs state claims based on the common law of service mark and trade name infringement, the common law of unfair competition and the Lanham Act, 15 U.S.C. § 1051 *et seq.*, which imposes federal statutory sanctions against unfair competition. (Count 2). In addition, plaintiffs make various other allegations as to defendant's acts in violation of his fiduciary duties as a partner. (Counts 3–5). The court's jurisdiction is invoked pursuant to 28 U.S.C. §§ 1331, 1332, 1337, 2201, and principles of pendent jurisdiction.

Defendant has counterclaimed with numerous contentions as to plaintiffs' breaches of their reciprocal fiduciary duty to him. In doing so, defendant has added Harrah's Inc., HI's Nevada casino gaming subsidiary, as an additional counterclaim defendant.

This action is presently before the court on an application by plaintiffs for an order, *inter alia,* preliminarily enjoining defendant from

(a) using the word "Trump" in any form, alone or in combination with other words, whether on signs, slot machines or other fixtures or articles, or in advertisements, telephone directories, brochures, press releases or otherwise, in connection with his new Atlantic City casino hotel; or

(b) conveying, encumbering or otherwise taking steps adverse to plaintiffs' interests in connection with any real property acquired by him, as nominee for himself and one or both of them, without their consent.

In their reply papers, plaintiffs requested that the court consolidate the preliminary injunction hearing on the land issue with a final hearing on their application for

(a) a declaratory judgment that defendant acquired and holds title to the parcels of real property forming the site for the Partnership's adjacent parking accommodations as nominee for plaintiffs and/or the Partnership, and

(b) an order directing defendant to convey title to the parcels to the Partnership, or, alternatively, to some other partnership composed 50% of plaintiffs and 50% of defendant.

On June 28, 1985, the court conducted a hearing on plaintiffs' application based on pleadings, affidavits, exhibits, written briefs and oral arguments of the counsel.

The court subsequently determined that discovery and live testimony would not materially improve the state of the record as to the merits of plaintiffs' claims for injunctive relief with respect to ownership of the parking facility properties as well as use of the name "Trump." Consequently, on July 11, 1985, the court advanced and consolidated a trial on the merits with the hearing on plaintiffs' application for a preliminary injunction, pursuant to Fed.R. Civ.P. 65(a)(2).

Based on all the submissions of the parties and the remainder of the record in this matter, the court makes the following Findings of Fact and Conclusions of Law.

## FINDINGS OF FACT

### I. INTRODUCTION

#### A. Parties and Witnesses

1. Plaintiff HI is a corporation organized under the laws of the State of Tennessee and has its principal place of business in Memphis, Tennessee. Complaint ¶ 3; Answer ¶ 3.

2. Plaintiff HAC is a corporation organized under the laws of the State of New Jersey and has its principal place of business in Atlantic City, New Jersey. HAC is a wholly owned subsidiary of HI. Complaint ¶ 4; Answer ¶ 4.

3. Defendant Donald J. Trump is a citizen of the State of New York, residing in and having a principal place of business in New York City. Complaint ¶ 5; Answer ¶ 5.

4. Philip G. Satre is President and Chief Executive Officer of Harrah's, a subsidiary of HI, President of HAC, and President of the Gaming Group of HI. Affidavit of Philip G. Satre, June 13, 1985 ("Satre Aff."). Satre's supplemental affidavit of June 25, 1985 is referred to herein as "Satre Supp. Aff."

5. Richard J. Goeglein is President and Chief Operating Officer of Holiday Corporation, the parent corporation of HI, a position he has held since September, 1984. Prior to assuming that position, he was President and Chief Executive Officer of Harrah's and Chairman of HAC. Goeglein was succeeded as President and Chief Executive Officer of Harrah's by Satre in October, 1984. Affidavit of Richard J. Goeglein, June 25, 1985 ("Goeglein Aff.") ¶ 1. Goeglein's supplemental affidavit of June 27, 1985 is referred to herein as "Goeglein Supp.Aff."

6. James L. Schorr is Executive Vice President and a member of the Board of Directors of Holiday Corporation, with primary responsibility for corporate strategy and new business development. Schorr is also a director of Harrah's and has been involved in marketing decisions relating to the Partnership's casino hotel.

7. Gary Selesner is Manager of Advertising for the Partnership's casino hotel. Selesner has been employed in advertising and related fields since 1976. Affidavit of Gary Selesner, June 13, 1985 ("Selesner Aff.") ¶ 1.

8. Arturo Camacho is Manager of Bus Operations for the Partnership's casino hotel. Affidavit of Arturo Camacho, June 13, 1985 ("Camacho Aff.") ¶ 1.

9. Jack Trout is a partner in Trout & Ries Advertising, Inc., in New York City, an agency specializing in strategic marketing and promotions. From late 1983 until late 1984, Trout and the firm of Trout & Ries were actively engaged in promoting the Partnership's casino hotel. Affidavit of Jack Trout, June 13, 1985 ("Trout Aff.") ¶¶ 1–2. Trout's supplemental affidavit of June 25, 1985 is referred to herein as "Trout Supp.Aff."

10. The defendant, Donald J. Trump, testified on his behalf. Affidavit of Donald J. Trump, June 25, 1985 ("Trump Aff.").

11. For a number of years, HI, including its wholly owned subsidiary Harrah's, has had the largest gaming operations of any company in the world. Harrah's has been involved in the gaming industry for over forty years. HI now owns casino hotels in Las Vegas, Reno and Lake Tahoe, Nevada. Since 1980, HI has also operated "Harrah's Marina Hotel Casino" in the Marina section of Atlantic City.[1] The Harrah's name and service mark have been well known among casino hotel patrons and the general public for many years in the Western United States, and since at least the early 1980s in the Eastern markets served by Atlantic City. As a result of Harrah's large expenditures on advertising and its successful operations, the Harrah's name and service mark constituted a valuable asset in connection with gaming at the time of the formation of the Partnership, and continues to do so. Satre Aff. ¶ 6; Trump Aff., Exhibit C at 105, 114, 145, 159, 163, 164.

12. Defendant Donald J. Trump has acquired a national reputation as a leading real estate developer and entrepreneur. During the last ten years, he has successfully promoted, developed and constructed numerous commercial and residential properties throughout New York City and in New Jersey. Many of the enterprises are valued in the hundreds of millions of dollars and have attracted substantial publicity. In early 1982, at the time the parties began discussing a partnership venture, defendant had underway three developments in New York City which gained much public attention: the Grand Hyatt Hotel, the largest hotel built in New York in twenty years; the Trump Tower, a 68-story residential and commercial building on Fifth Avenue; and Trump Plaza, a 40-story residential building in midtown Manhattan.

---

**1.** The Boardwalk is an area of downtown Atlantic City on the ocean. The Marina area is on the bay and, depending on traffic, is a ten to twenty minute drive from the Boardwalk.

With the completion of these projects and because of other ventures, defendant's status as a public figure has grown steadily since then. In September, 1983, defendant received particularly wide media exposure for his acquisition of the New Jersey Generals of the United States Football League. Trump Aff. ¶¶ 4–6; Goeglein Aff. ¶ 6.

13. Defendant began investing in Atlantic City real estate in July, 1980 when he assembled the present site of the Partners' casino hotel. The same year, defendant reserved a gaming license with the Casino Control Commission. Defendant purchased additional land across from the Boardwalk site, the so-called "Hertz" parcel, in April, 1982. On May 18, 1982, defendant began construction of the "Trump Plaza Hotel & Casino." Trump Aff. ¶ 9, Exhibit C at 36, 51, 163.

### B. Formation of the Partnership

14. The parties began negotiating a joint venture in May, 1982. Satre Aff. ¶ 6. The parties were apparently attracted to one another for their respective areas of expertise: Harrah's in gaming operations; Trump in real estate development. *See, e.g.,* Trump Aff., Exhibit C at 163; Satre Aff. ¶ 35.

15. The parties eventually agreed to form a general partnership pursuant to a written agreement, dated June 30, 1982, between HAC and Trump Plaza Corporation. The Partnership, "Harrah's Associates," was formed to develop, own and operate a casino hotel in Atlantic City. Trump Plaza Corporation assigned all of its rights in the Partnership to defendant, its sole shareholder, by an assignment dated June 30, 1982. The Partnership Agreement, Satre Aff., Exhibit 1, provides that New Jersey law governs the construction of the agreement and the partners' obligations thereunder. Complaint ¶ 6; Answer ¶ 6; Satre ¶ 2; Partnership Agreement § 4.1.

16. Under the Partnership Agreement, responsibility for construction was delegated, to Trump Partnership Agreement § 5.9, and responsibility for operating and managing the Partnership facilities was delegated to HAC. Partnership Agreement § 5.10.

17. The Partners' Boardwalk casino hotel opened on May 14, 1984, under the name "Harrah's at Trump Plaza." Trump Aff. ¶¶ 20–21.

18. In April, 1985, Trump concluded an agreement with the Hilton Hotels Corporation ("Hilton") to acquire from Hilton a newly constructed casino hotel located in the Marina section of Atlantic City. Negotiations between Trump and Hilton were first announced by Hilton on April 18, 1985, and an agreement was announced April 20, 1985. Satre Aff. ¶ 23.

19. Hilton had built the casino hotel and staffed it but had been denied a gaming license by a deadlocked vote of the New Jersey Casino Control Commission on February 28, 1985. The Hilton property has a 3,000-car garage. Satre Aff. ¶ 24 & Exhibit 6.

20. On June 17, 1985, Trump opened the new facility under the name "Trump's Castle Hotel & Casino." Trump Aff. ¶¶ 35 & 37.

## II. PARKING FACILITIES

21. During the negotiations leading up to the creation of the Partnership Agreement, the Partners discussed the need for an adjacent parking garage ("the Parking Facility"), to enable the casino hotel to achieve its full revenue and profit. Complaint ¶ 17; Answer ¶ 17.

22. The Partnership Agreement provides that the purposes of the Partnership include:

> "To own, develop and operate the Property, including without limitation, the right to demolish existing structures and to construct thereon a 32-story first-class hotel with approximately six hundred twelve (612) guest rooms with a casino of approximately sixty thousand (60,000) square feet *and parking accommodations.*"

Partnership Agreement § 4.1(b) (emphasis added).

23. The Partnership Agreement also provides that, subject to certain conditions, "all expenses of acquiring, owning, developing, financing or otherwise incurred in connection with the Property and the Parking Facility shall be borne and paid for by the Partnership, and all income from the Property and the Parking Facility shall belong to the Partnership." Partnership Agreement § 5.4.

24. Trump had already begun to assemble the land on which the Parking Facility would be built at the time the Partnership Agreement was executed. Defendant purchased lots 20, 21, 28 and 59 on the block across from the hotel site, together known as the "Hertz" or "Rothenberg" parcel, in April, 1982. Defendant contributed this property to the Partnership as part of the June 30, 1982, agreement. Partnership Agreement § 6.1(a)(ii), Schedule A ("Basic Documents," "Hertz Parcel," and "Parking Facility"). Schedule B, "Tract IV"; Schedule C, Note 4; Schedule F at c.

25. The Partners entered into two letter agreements ("the Letter Agreements") dated November 2, 1982 and February 2, 1983, which contemplated the formation of a new partnership between Trump and Holiday Inns to develop and manage a parking facility for the casino hotel. The Letter Agreements authorized Trump to acquire title to various identified parcels which the Partners deemed suitable as a site for parking facilities. Trump was to hold title to the properties in his own name as nominee for the new partnership, pending the formation of the same. Each of the Partners was to advance 50% of the cash necessary to purchase such properties. Trump Aff. ¶ 48, Exhibits T, U; Satre Aff. ¶¶ 40, 41, Exhibit 15. A bank account was established to receive the partners' contributions to the new partnership, denominated the "Donald J. Trump—Parking Account No. 134-0-57256." Satre Aff., Exhibits 15 & 18.

26. The Partnership Agreement provides for such an arrangement:

A nominee or agent may be utilized by the Partnership in the conduct of its business. The use or designation of such nominee or agent shall in no way affect or diminish the obligations, undertakings or liabilities of the Partners hereto to one another.

Partnership Agreement § 4.5(a).

27. Plaintiffs and defendant jointly authorized the purchase of the land on which the Parking Facility was to be built. For example, at the Partnership Executive Committee meeting of December 6, 1982, defendant described the parcels he had recently acquired and "the Committee unanimously authorized Mr. Donald Trump to acquire two out parcels on Mississippi Avenue." Satre Aff. ¶ 41 & Exhibit 16; see also Exhibits 17–19. As of May, 1985, HI and Trump had each contributed approximately $5,000,000 to the purchase and maintenance of properties designated as the site for the Parking Facility. Complaint ¶ 19; Answer ¶ 19; Satre Aff. ¶ 42; Trump Aff. ¶¶ 49 & 58.

28. Both Partners have fully performed their promises contained in the Letter Agreements in that Trump has acquired the properties identified therein, and the Partners have each contributed fifty percent of the funds necessary to purchase and maintain the properties. Trump Aff. ¶ 49; Satre Aff. ¶ 42; Tr. at 54–55.

29. The partnership "to be formed" in accordance with the Letter Agreements has not yet been created, as the Partners have been unable to agree on the terms according to which the new partnership entity will operate. There exists substantial disagreement between the Partners regarding the proper cost and design of a parking facility, the appropriate method for financing such a project and other issues. Tr. at 54–55.

30. The undeveloped property purchased and contributed by the Partners and designated for construction of a parking facility ("the Parking Facility Properties") currently constitutes the only lot adjacent to the casino hotel which is available for that purpose. The lot now contains approximately 40 percent of the casino hotel's parking spaces and is used to load and unload buses which transport customers

and employees to the casino hotel. Satre Aff. ¶ 43; Complaint ¶ 20; Answer ¶ 20. Since its opening, the casino hotel has turned away many customers due to a shortage of adequate parking facilities. Satre Aff. ¶ 37.

31. Between July, 1984 and June, 1985 more than 900,000 customers arrived at the Hotel on more than 28,000 buses. It is projected that during 1985 more than 1,100,000 customers will arrive by bus. Camacho Aff. ¶ 4. The Atlantic City Transit Authority has given the Hotel permission to handle only six buses per day at the Hotel itself, and only in the nonpeak period between 2:00 a.m. and 10:00 a.m. Camacho Aff. ¶ 6 and Exhibit.

32. Continued access to the Parking Facility Properties is crucial to the Partnership's casino hotel operations. Without them, the Partnership would lose a major portion of its present facilities for customer parking and a crucial link in its system of transporting customers and employees to its casino hotel by bus. The Parking Facility Properties also constitute the best site for future construction of a multi-level parking complex. Consequently, the parties acknowledge that if the properties were transferred or encumbered, the Partnership's facility would suffer a serious blow. Tr. at 53; Satre Aff. ¶¶ 37, 38.

33. Public officials agree that the Parking Facility Properties are an important component of the Partnership's operation. In an April 9, 1984 letter to the New Jersey Casino Control Commission, the State of New Jersey Division of Gaming Enforcement made the following findings:

"... [I]it is quite evident that the premises in question are vital to the proposed casino hotel project. Parking facilities are scarce in the city, and the premises are important to the accommodation of hotel guests and bus patrons."

Satre Aff. Exhibit 13 at 4 & 6.

34. Despite their differences concerning formation of a partnership to build and run a parking garage, the parties agree that development of new parking accommodations is vital to the prospects of the Partnership's facility.

a. On September 21, 1984, Michael Rose, then Chairman and Chief Executive Officer of HI, wrote defendant to memorialize a conversation in which the Partners

agreed that the parking garage is an essential element to this project and has been recognized from the beginning as giving a true competitive advantage in Atlantic City. We recognized the need to get underway as soon as possible with the construction.

Satre Supp.Aff., Exhibit 4.

b. The Partnership included a proposal for a parking garage in its casino facilities proposal to the New Jersey Casino Control Commission, part of its application for a casino license. Satre Aff., Exhibit 13.

c. Philip Satre has stated that

ample parking facilities ... are of critical importance in the congested Boardwalk area of Atlantic City ... At present, unlike its competitors that have built parking garages on adjacent land, the [Partnership's] Hotel is forced to operate with ... parking spaces spread out over approximately ten different surface lots, some of which are 15 to 30 minutes from the Hotel in normal traffic ... Since its opening, the Hotel has been forced to turn away thousands of gaming customers because it lacks adequate parking spaces.

Satre Aff. ¶ 37.

d. Defendant has indicated his awareness of the importance of ample parking accommodations in marketing his new facility. Recently, defendant's ads for "Trump's Castle ..." have stressed the presence there of an adjacent "3,000-car indoor garage." *See, e.g., The Atlantic City Press,* August 30, 1985, "Venture" Section at 7, 8, 9, 10.

35. The problems caused by the inadequate parking facilities at the Partnership's casino hotel adversely affect the surrounding community. The Atlantic City Planning Board, in a Decision and Resolution dated September 7, 1983, has found a "community need" for multi-level parking facilities in the area of the Partnership's casino hotel, and it has reaffirmed that

need as recently as May, 1985. Satre Aff. ¶ 39 & Exhibit 14. The community's interest in the development of new parking facilities adjacent to the Partnership's facility is reflected in the strict limits placed on use of the Parking Facility Properties as surface parking lots. It is undisputed that

The most recent extension of the Hotel's right to use the land for surface parking, granted in early May 1985, was conditioned on submission within 30 days of an acceptable plan for, and posting a bond to cover the cost of, required permanent improvements to the land if construction of a parking facility is not begun by October 15, 1985.

Satre Aff. ¶ 46 & note 11.

36. During the course of intense and often hostile negotiations between the Partners as to development of the Parking Facility, defendant's agents have asserted that defendant is the sole owner of the Parking Facility Properties:

(a) In a letter dated October 31, 1984, from Harvey Freeman, Senior Vice President of the Trump Organization, to Christopher Whitney, HAC Senior Vice President, Law and Government, Freeman asserted that the land for the planned Parking Facility was in fact "owned by Donald Trump totally," that the Partnership's casino hotel was a "tenant at will and may be terminated at any time," and that rent was due Trump by the Partnership for its use of the land. The letter further stated "based on our mutual inability to form a Partnership with respect to said parking site, we would like you to inform us as to which account to return the monies advanced by you. . . ." Satre Aff. ¶ 44(a) & Exhibit 21.

(b) In a letter dated January 10, 1985, Robert Trump, defendant's brother and Executive Vice President of the Trump Organization, "firmly endorse[d] the position stated by Harvey I. Freeman in his letter of October 31, 1984 to Chris Whitney regarding the entire parking and Transportation Center issue." He described the Parking Facility land as "Donald J. Trump's property" and "the site owned by Donald J. Trump," and he wrote that "the owner of the parking land (Donald J. Trump) has never had any obligation under law or otherwise . . . to continue to provide the existing surface parking for the casino hotel." He advised plaintiffs "to make alternate arrangements for [the Partnership's] parking and bus loading and unloading requirements." Satre Aff. ¶ 44(b) & Exhibit 22.

37. Defendant received copies of both letters by his agents which assert his sole ownership in the Parking Facility Properties. With respect to the letters, defendant has stated that "I do not intend to imply that they were unauthorized or that I disagree with the substance of the statements contained therein." Trump Aff. ¶ 56. At no time, however, has defendant actually taken affirmative steps to convey or encumber the Parking Facility Properties; nor has he himself threatened to do so.

38. In his Answer, defendant denied plaintiffs' allegation that he had acquired the "Hertz" parcel "for transfer to the Partnership at the time of the Partnership's original formation." Complaint ¶ 18; Answer ¶ 18. There is no merit to plaintiffs' claim that this too constitutes an unwarranted assertion of sole ownership. Defendant's denial was proper as he purchased the "Hertz" parcel in April, 1982, prior to the start of serious partnership negotiations between the parties, which occurred, by plaintiffs' own testimony, in May, 1982. *See supra*, Findings of Fact P 24; Satre Aff. ¶ 6.

39. In May, 1985, plaintiffs asked defendant to sign deeds reflecting their ownership in the Parking Facility Properties. Plaintiffs initially made their request in connection with a proposal that they assume full responsibility for construction of a parking facility. Plaintiffs allegedly hoped to speed development of a new garage thereby. Satre Aff. ¶ 45. In this action, plaintiffs urge the court to order such a transfer.

40. Defendant has consistently refused plaintiffs' requests to execute documents recognizing their interests in the Parking

Facility Properties. He has also rejected the proposal to transfer responsibility for development of a new garage. Defendant originally characterized formal recognition of plaintiffs' interests as unnecessary and undeserved. In a May 13, 1985 letter to Harrah's President Philip G. Satre, defendant said:

[e]ffectively, you are stating our position that you do not own the land ... I was nevertheless willing, based on our prior agreement [to build a parking facility] (which you now dishonorably dismiss), to complete said documentation, so that a garage can be built, ... [even though] your inept management of the casino hotel facility causes me great doubt as to whether or not spending additional funds on a parking facility is justifiable.

Satre Aff., Exhibit 23 at 2. Defendant has since demanded that plaintiffs compensate him for acknowledging their interests. Satre Aff. ¶ 45; Trump Aff. ¶¶ 58, 59.

41. Defendant bases his actions on the contention that until a new Parking Facility partnership is formed, plaintiffs have only an unequal, equitable claim in the Parking Facility Properties. Trump Aff. ¶ 58. Defendant claims a greater interest due to his efforts in assembling the Parking Facility site. *Id.* ¶ 60. Defendant maintains that if the Partners succeed in setting up a separate partnership to construct and manage a new parking facility, the present Partnership should pay the new partnership rent for use of the property dedicated to the facility. If the new partnership is not formed, plaintiffs are only entitled to reimbursement for monies paid toward the purchase of the land. *Id.* ¶¶ 58, 59.

42. At oral argument, counsel for defendant stated that defendant acknowledges that since execution of the Partnership Agreement, he had purchased several parcels of land with partnership funds "merely as a titleholder ... for [a] new entity ... to be formed to construct and operate a parking garage." Tr. at 54. Counsel for defendant also stated that defendant acknowledges and agrees to abide by all agreements he has entered into in connection with the Partnership's casino hotel. Tr. at 55. This statement implies

that defendant recognizes his contribution of the "Hertz" parcel to the Partnership as part of the Partnership Agreement. *See supra,* ¶ 4. Finally, counsel for defendant stated that defendant does not intend to convey or encumber any of the Parking Facility Properties. Tr. at 55.

43. The court finds these statements by defendant's counsel, who is fully authorized to speak for his client, to be credible. Having been made in open court, they carry considerably more weight than the remarks of defendant or defendant's agents in the course of heated negotiations with plaintiffs. Furthermore, the record shows no significant evidence to support plaintiffs' claims that defendant intends to convey or encumber the "Hertz" parcel or the other parcels composing the Parking Facility Properties. In particular, defendant's acknowledgement of his role as title holder for a new partnership to be formed by the parties indicates his lack of an intention to interfere with the Partnership's use of such properties.

### III. USE OF THE NAME "TRUMP"

#### A. The Partnership Agreement

44. Section 15.10 of the Partnership Agreement provides that the Hotel shall be named " 'Harrah's Boardwalk at Trump Plaza' or such other name as shall be selected by the Partners."

45. The Partnership Agreement contains two provisions which address the Partners' rights to use the name "Harrah's."

(a) Section 5.1(c) states:

It is hereby acknowledged that Harrah's owns and controls the name and service mark 'Harrah's and said service mark is properly registered in the United States. HAC, on behalf of Harrah's, hereby grants to the Partnership during the term of this Agreement the right to use the name 'Harrah's' solely in connection with the name and operation of the Hotel. In that connection, so long as HAC or any affiliate thereof is the manager of the Partnership pursuant to Sec-

tion 5.10, the Hotel shall be operated as a 'Harrah's' Hotel and HAC or such affiliate shall cause the name 'Harrah's' or any variant thereof, to be available for use by the Partnership. [Trump] and the Partnership acknowledge that they have no ownership or other right, title or interest in the name 'Harrah's' or any variant thereof and agree that upon any termination of the Partnership, termination of any Partner's interest in the Partnership, or termination of HAC as manager and operator pursuant to Section 5.10, as the case may be, they will not thereafter use the name 'Harrah's' in any way.

(b) Section 5.13(b) states:

HAC and [Trump] acknowledge that affiliated companies of HAC own and operate Harrah's Marina Hotel Casino in the 'Marina Area' of Atlantic City, New Jersey (the 'Marina Area'). Recognizing that the operation of the Marina Hotel will result in competition with the Hotel and that there may hereafter be construed to be a conflict of interest as a consequence of HAC's position with respect to both hotel/casinos, the Partners for themselves and the Partnership hereby expressly waive any claim or cause of action which they may have against each other or against Holiday Inns, Inc. or Harrah's, a Nevada corporation ('Harrah's') arising solely from the fact of their ownership, development or operation of the Marina Hotel, competitive though it may be. Nothing contained in this Section 5.13(b) shall be construed to diminish the fiduciary obligations of HAC as a Partner to perform its duties hereunder in good faith and in the best interests of the Partners and the Partnership in accordance with the terms of this Agreement.

46. The Partnership Agreement contains no provisions comparable to Section 5.1(c) with respect to the name "Trump." The Partnership Agreement contains no express limitations on either Partner's right, title or interest in the use of the name "Trump" nor on either Partner's ability to create and protect a service mark that included the name "Trump." None were proposed by either party during any negotia-

tions between the Partners. Satre Aff. ¶ 10; Goeglein Aff. ¶ 3.

47. The parties' agreement contains a broad provision permitting competition between the Partners:

The individual shareholders of each Partner, consistent with their fiduciary obligations as Partners, but without accountability to the Partnership or to the other Partner, and without any consent whatsoever, may engage independently or with others in other business ventures of every kind and nature, including, but not limited to, the ownership, financing, leasing, operation, management, brokerage, sale and development of real property, whether or not competitive with the business of the Partnership or any of its assets, and neither the Partnership nor the Partners, as such, have any rights by virtue of this Agreement in and to said independent ventures or to the income or profits derived therefrom.

Partnership Agreement § 5.6.

48. There is a serious dispute between the parties as to the intended effect of the Partnership Agreement with respect to defendant's right to use his name in connection with a subsequent independent casino venture. Plaintiffs believed that by reserving rights to the Harrah's name, they communicated to defendant their "position, that [a party] didn't have [such a] right unless [the party] expressly reserved it." Tr. at 28. Plaintiffs allegedly assumed that defendant failed to reserve rights in his name, and thus bargained away such rights, because he knew plaintiffs would not agree to acknowledge them. Id. at 25, 28–29. Defendant, however, expected that "if Harrah's wished to restrict his (Trump's) right to use his own name, there would have been such a restriction in the contract." Id. at 48.

49. Plaintiffs' representatives stated that if they had known of defendant's expectations, they would have acted differently.

(a) Richard Goeglein testified:

HAC would not have agreed to include 'Trump' in the name of the Partnership's

hotel casino had Mr. Trump asked to include a provision or otherwise indicated that he reserved a right at some future date to use that name to promote another hotel casino in Atlantic City.

Goeglein Aff. ¶ 4.

(b) Philip Satre testified:

[Trump] did not then indicate any desire, plan or purported right to use the name Trump in association with any other Atlantic City casino hotel. Had he done so, we would never have agreed to use the work Trump in the casino hotel's name. The notion that HAC would expend money and resources to publicize the name 'Trump'—a name that had no secondary meaning in connection with casino gaming at that time and which we did not want to include in the facility's name at all—only to have defendant use that name in connection with a competing Atlantic City casino hotel—would have been completely repugnant to us.

Satre Supp.Aff. ¶ 4.

50. Defendant has said that he would have made different demands of plaintiffs during the partnership negotiations if he had known of their expectations. Defendant has stated that HAC never declared its belief that it had greater rights in the name "Harrah's" than defendant did in his name. Trump Aff. ¶ 15. Defendant also said:

[T]here was never any doubt that the Partnership Agreement I have with plaintiffs specifically authorizes me to open another 'Trump' Hotel and Casino, just as it authorizes plaintiffs to open another 'Harrah's' hotel and casino. If it did not, I would not have gone into the Partnership.

Trump Aff. ¶ 12. *See also id.* ¶ 11. Defendant testified further that he understood the freedom of competition clause to guarantee both parties the right to open new competing facilities, *id.* ¶ 13, and that he assumed HAC demanded a reservation of rights clause for the Harrah's name because it already had another "Harrah's" facility in operation. *Id.* ¶ 11. Defendant allegedly assumed he was granting the Partnership no more than a nonexclusive

license to use his name for Partnership purposes. *Id.* ¶ 14.

51. At the time the parties negotiated their Partnership Agreement, plaintiffs understood that defendant was prepared to construct, own and operate a casino hotel in Atlantic City on his own. *See* Trump Aff. ¶ 7. Plaintiffs further understood that defendant, as a holder of a casino hotel owner-operator license, is eligible to receive permission to own and operate up to two additional such facilities in Atlantic City. N.J.S.A. 5:12–82(e). In addition, plaintiffs knew of defendant's practice of naming his major projects after himself. *See supra,* Findings of Fact ¶ 12; *infra,* ¶ 72. Consequently, plaintiffs had no rational basis for a belief that defendant would not at some future time seek to own or operate another casino hotel in Atlantic City, or that defendant would not expect to use his name in connection with such a facility.

**B. The Name of the Partners' Facility**

52. The parties dispute the nature and relative importance of their respective roles in changing the name of their casino hotel from "Harrah's Boardwalk at Trump Plaza" to "Trump Casino Hotel." Nevertheless, it is plain that both Partners considered such changes beneficial to the economic prospects of their casino hotel.

53. The Partnership Agreement tentatively specified the name of the Partners' future facility as "Harrah's Boardwalk at Trump Plaza." *See supra,* Findings of Fact ¶ 44. Philip Satre testified that this preliminary choice was made

jointly by the Partners. It was designed (i) to use the goodwill and name recognition associated with the Harrah's name and service mark while at the same time distinguishing it from Harrah's Marina Hotel Casino through the geographical designation 'Boardwalk' and the descriptive noun 'Plaza,' and (ii) to allow the Hotel to build its own goodwill and to develop a separate customer base associated with the Trump name and the Boardwalk location.

Satre Aff. ¶ 8. In light of this admission, the court need not address plaintiffs' contentions that the name was chosen largely because of defendant's "entreaties." *See* Goeglein Aff. ¶ 3; Trout Aff. ¶ 5; Satre Supp.Aff. ¶ 4.

54. During the spring and summer of 1984, the Partners engaged in extensive discussions concerning the name of their facility. Defendant believed that "a more prominent use of [his] name ... would benefit the Partnership"; consequently, he pressed plaintiffs to adopt the name "Harrah's at Trump Plaza." Trump Aff. ¶ 19; Goeglein Aff. ¶ 5. Defendant also thought the word "Boardwalk" "cheapened" the facility's name. Goeglein Supp.Aff., Exhibit 1. Plaintiffs' proposed "Harrah's Atlantic Palace at Trump Plaza." Defendant rejected this option as verbose. By May, 1983, the Partners could not agree on a new name. *Id.*, Exhibits 1–3.

55. In September, 1983, shortly after defendant's acquisition of the New Jersey Generals, plaintiffs agreed to the change proposed by Trump. Plaintiffs had come to accept defendant's view that his personal prominence would help publicize the new casino hotel. Goeglein Aff. ¶ 6; Satre Aff. ¶ 11. The parties amended the Partnership Agreement accordingly, in an agreement dated September 27, 1983. The agreement, which consists of a letter from Richard Goeglein to defendant and is signed by both, states in pertinent part:

(a) "I have pursued our name discussion and suggest the 'Harrah's at Trump Plaza' name and logo enclosed. It gives us the opportunity to take full advantage of your personal prominence, reputation and recognition."

(b) "As I have thought about your comments/thoughts, it seems to me that with your unique public status and access to the media, you have the opportunity to give our project a great deal of publicity, especially in the Northeastern United States."

Trump Aff., Exhibit A.

56. Plaintiffs argue that they never would have approved of (a) the Letter Agreement, or (b) the decision to adopt and promote the name "Trump Plaza," or (c) the decision to adopt and promote the name "Trump Casino Hotel," if they thought defendant reserved a right to use his name in a subsequent casino hotel venture. Goeglein Aff. ¶¶ 7, 8, 10. Accordingly, plaintiffs contend that by the terms of the Letter Agreement, defendant granted the Partnership exclusive rights to the use of his name "[i]n consideration for [Harrah's Associates] giving the name 'Trump' more emphasis." Tr. at 27. This interpretation is not supported by the language of the Letter Agreement or the other evidence in the record. Just as it is implausible that Trump implicitly forfeited rights to his name in the Partnership Agreement, it is unreasonable to conclude that he did so in the parties' amendment thereto. It is more reasonable to conclude that plaintiffs simply *assumed* defendant had no right to use his name in a subsequent venture.

57. Defendant subsequently pressed plaintiffs to feature his name and to abandon any reference to "Harrah's." Plaintiffs resisted. Consequently, the Partners hired Jack Trout's advertising firm to study alternatives. The firm proposed "Atlantic Palace." Plaintiffs like the idea; defendant did not. Trout Aff. ¶¶ 6, 7. Trout also testified that he tried to sell the idea to defendant on the grounds that if he ever wished to build or buy another casino hotel "he would be free to use the name 'Trump' ... because the partnership's casino would not have used and promoted that name." *Id.* ¶ 7. Trout does not explain the basis for the opinions he expressed as to defendant's rights.

58. In the fall of 1984, the Partners decided to stop featuring the name "Harrah's" in most advertising for their casino hotel. They announced their adoption of the name "Trump Plaza" on October 2, 1984. Satre Aff., Exhibit 2.

59. The decision to drop the name "Harrah's" derived from the parties' desire to reduce confusion between their establishment and "Harrah's Marina Hotel Casino." Satre Aff. ¶ 13; Trout Aff. ¶ 5.

60. The Partners chose the name "Trump Plaza" at least partly because defendant favored it. Satre Aff. ¶ 13; Trout Aff. ¶¶ 4, 8. It also appears that the Partners acted as they did because the term "Trump Plaza" had come to be associated with their casino hotel. *See* Trump Aff., Exhibit C at 25, 39, 41, 46, 50, 55, 83, 111, 115, 125.

61. In January, 1985, the Partners consulted a new advertising agency, which recommended further simplification of the name of the Boardwalk facility to "Trump Casino Hotel." Defendant does not deny that he initiated these efforts. *See* Satre Supp.Aff. ¶ 5; Goeglein Aff. ¶ 9. The Partners expressly agreed to the change in February, 1985. Satre Aff. ¶ 19. Over defendant's objections, plaintiffs registered "Trump Casino Hotel" as a service mark of the Partnership in May, 1985. Satre Supp. Aff. ¶ 5, Exhibit 5; Trump Aff. ¶¶ 25–29.

62. Between June, 1982 and February, 1985, the Partners agreed to decrease emphasis of the name "Harrah's" and to increase emphasis of the name "Trump." Plaintiffs went along with this pattern because their self-interest coincided with the preferences of defendant. The name changes reduced confusion with plaintiffs' other casino hotel and took advantage of the increasing prominence of defendant's name. Because the words "Trump Plaza" were included in the facility's original title, the name Trump gradually became associated with the Partnership's casino hotel. To drop *both* "Harrah's" and "Trump" would have sacrificed all the publicity benefits of previous names. Plaintiffs' insistence that they were willing to do so is implausible; if true, it was reasonable for defendant to object to such a course.

It is essential to view the record with these facts in mind in order to properly understand plaintiffs' claims that defendant forced them to accept name changes with his relentless entreaties. Plaintiffs, as equal partners, could not have been forced to go along with defendant's proposals. It is more difficult to comprehend plaintiffs' failure to demand express restrictions on use of defendant's name. Nevertheless, plaintiffs have failed to present any substantial evidence to support their arguments that such restrictions were implicit in the parties' dealings and agreements.

### C. Efforts to Promote the Trump Name

63. The Partnership engaged in extensive efforts to promote the "Trump Plaza" name between October and December, 1984. Such activities included:

(a) television ads, at a cost of $1.3 million, on all three network affiliates in New York and Philadelphia, and on local Atlantic City cable television;

(b) radio ads, one minute in length, on eleven stations on the Atlantic seaboard;

(c) print ads, in over 38 newspapers and magazines; and

(d) billboard ads, on taxis, buses and subways and on signboards on roads approaching Atlantic City.

Satre Aff. ¶¶ 16–18, Exhibit 3.

64. Since late March, 1985, the Partners have also maintained a large campaign to promote the "Trump Casino Hotel" name. Through June, 1985, the Partnership had expended over nine million dollars on the "Trump Plaza" and "Trump Casino Hotel" campaigns. By then, the Partnership's ads had appeared in over 50 newspapers, and over 12 magazines. The Partnership spent $1.2 million on directional signs reading "Trump" located throughout Atlantic City. Over one million items have been distributed by the Partnership bearing the Trump name and various logos associated with the Partnership's hotel. Satre Aff. ¶ 21; Satre Supp.Aff. ¶ 7, n. 3.

65. Despite the Partners' efforts to feature the Trump name, numerous features of their casino hotel and associated services continue to display prominently the "Harrah's at Trump Plaza" slogan, including,

(a) the huge signs on the exterior of the facility, Trump Aff. Exhibit F;

(b) signs on the outdoor front entrance and imprinted on the adjacent sidewalk, *id.* Exhibits G, H, L;

(c) signs adorning all slot machines, *id.* ¶ 31;

(d) planters on the sidewalk adjacent to the casino hotel, *id.* Exhibit K;

(e) some parking facility signs, *id.* Exhibit I;

(f) some directional signs within Atlantic City, *id.* Exhibit J; and

(g) some hotel room accessories, *id.* Exhibit M.

As a result, the Partnership's facility continues to be associated with Harrah's.[2] While the Partners have plans to eliminate some of the most significant items still bearing the Harrah's name, they have made an economic decision to phase out all such items gradually. Satre Supp.Aff. ¶ 7, Exhibit 6.

66. Plaintiffs have submitted the results of a public opinion survey conducted in December, 1984, which purports to quantify recognition of the Partnership's facility. The survey measured awareness of the casino hotel among persons within 250 miles of Atlantic City. Plaintiffs have failed to submit any details concerning design and implementation of the survey, such as the research method, sample size, author of the survey, or the questions asked. Assuming the results to be valid, however, the survey's most important findings are that the Partnership's facility was

(a) well-recognized among gamblers (81%) and nongamblers (third ranking among all casino hotels);

(b) becoming more reknowned faster than any other casino hotel; and

(c) well known for its ads among gamblers (ranked third).

Satre Aff. ¶ 22. The firm which conducted the survey concluded that the Partnership's advertising campaigns had been very successful. *Id.* Nevertheless, the court is unable to tell what, if anything, the survey says about the public views as to the *source* of the services available at the Partnership's facility.

**2.** *See, e.g., Atlantic City Press,* September 11, 1985, p. 1. A photo above the front page feature story ("Pageant Parade Thrills Crowd") is described as follows: "THE BIG WINNER—'Halley's Comet,' an elaborate float entered by *Har-*

67. It is undisputed that the Partnership's facility is presently associated with the name "Trump," and the terms "Trump Plaza" and "Trump Casino Hotel," as well as the name "Harrah's." The relative strength of these associations is contested, however.

## D. Defendant's New Casino Hotel

68. There is a dispute among the parties as to whether defendant (a) concealed from plaintiffs his decision to use his name in connection with his new casino hotel, and (b) chose to use his name for his new facility in order to benefit from the Partnership's promotion of the Trump name.

69. With respect to concealment, plaintiffs allege that defendant initially told Philip Satre that he did not intend to use his name in connection with his new casino hotel. Satre Aff. ¶¶ 25, 27. Defendant later wrote a letter denying that he had misled Satre and stating that he had warned Satre he might use his own name. *Id.* ¶ 23. Thereafter, on May 14, 1985, the parties met and defendant refused to reveal whether he would do so. *Id.* ¶ 30. On May 20, 1985, one of defendant's agents wrote a letter to the New Jersey Department of State indicating defendant had previously registered the name "Trump Castle and Casino" and wished to apply it to his new facility. Trump Aff., Exhibit E. Plaintiffs finally learned of defendant's decision to use his own name by seeing ads in the newspaper for the "Trump Castle...." Satre Aff. ¶ 30, Exhibit 10.

70. For a short time during April and May, 1985, defendant may have concealed from plaintiffs his decision to use his own name in connection with his new casino hotel. There is insufficient evidence, however, to show that defendant misled his partners as to his intentions in this regard.

71. With respect to defendant's reasons for choosing to use his own name, plain-

*rah's Trump Casino Hotel,* captures the grand sweepstakes prize Tuesday evening in the Miss America Pageant Parade on Atlantic City's Boardwalk" (emphasis added).

tiffs point out that defendant's spokesman stated in May, 1985 that the name "Trump's Castle Casino Hotel" would reap benefits "from the strength of the success of Trump's name on the Boardwalk." Satre Aff. ¶ 28, Exhibit 8. Defendant allegedly assured Philip Satre, soon after acquiring the former Hilton property, that he would not use his own name in its title as that might be detrimental to the Partnership. Satre Aff. ¶ 27.

72. Defendant denies that he assured Philip Satre he would not use his own name for his new facility. Trump Aff. ¶¶ 24–26. Defendant states that he chose the name "Trump's Castle Casino Hotel" due to his "detailed ... personal involvement" in the project, and the "considerable publicity" attending his acquisition of the property. Id. ¶ 38. Trump also testified:

> it is now my experience that, with each new real estate project I develop, the use of my name in connection with the project is an invaluable asset. As business commentators have noted, my use of my name signifies both a high quality, successful project, and also a facility in which I am involved in depth.

Trump Aff. ¶ 40.

73. The record supports defendant's account of the facts. Defendant has advanced several plausible reasons for his actions, consistent with his past practices, other than the venal motives suggested by plaintiffs.

74. There has been a significant amount of confusion among members of the public between the Partnership's and defendant's casino hotels, including the following:

(a) mistaken phone calls;

(b) customer's going to one of the two facilities, when they have reservations at the other;

(c) taxi drivers delivering customers to one facility, when they wished to go to the other;

(d) baggage delivered from the airport to the wrong "Trump" facility;

(e) potential employees applying to work at the "Castle" making inquiries to the Partners' facility; and

(f) newspaper stories misidentifying events at the Partners' facility as occurring at the "Castle."

Satre Aff. ¶¶ 32(a), (b); Satre Supp.Aff. ¶ 8.

75. It is undisputed that all casino hotels in Atlantic City appeal to substantially similar customer populations and employ substantially similar channels of advertising. See Trout Supp.Aff. ¶ 6. All gaming facilities are also required by law to provide substantially similar services. Id.; see also N.J.S.A. 5:12–5, 6, 27, 83, 97, 98, 100, 102, 103.

76. It is undisputed that strict regulation of the casino industry renders competition difficult and makes it highly desirable for casinos to have unique identities. See Trout Aff. ¶ 3; Trout Supp.Aff. ¶ 6; Selsner Aff. ¶ 5; Schorr Aff. ¶¶ 4–5.

77. There is no substantial evidence in the record as to the impact, if any, of defendant's use of his own name in connection with his new casino hotel on revenues or profits at the Partnership's facility.

The following Conclusions of Law, insofar as they may be considered Findings of Fact, are so found by this court to be true in all respects.

## CONCLUSIONS OF LAW

### I. PARKING FACILITIES

1. Plaintiffs have presented evidence which shows that defendant and his agents have (a) made claims to sole ownership of the Parking Facility Properties, (b) refused to sign deeds formally recognizing plaintiffs' interests in these parcels, and (c) demanded payments from plaintiffs in return for execution of such documents. Findings of Fact ¶¶ 36–40. On this basis, plaintiffs seek an order (a) declaring that the Partners have an equal, 50% ownership interest in the properties in question, (b) requiring defendant to execute deeds formally recognizing plaintiffs' interest in the properties, and (c) enjoining defendant from taking any action to convey or encumber the properties.

2. With respect to plaintiffs' claims that defendant intends to transfer or encumber the Parking Facility Proper-

ties, the record indicates that (a) defendant has taken no such action, Findings of Fact ¶ 37, (b) defendant has never actually threatened to do so himself, *id.*, and (c) defendant has affirmatively indicated, through his counsel, that he has no intention of doing so. *Id.* ¶ 42. The principal evidence supporting the claim that defendant intends to prevent the Partnership from using the Parking Facility Properties is several statements by defendant's agents to the effect that the Partnership's operations there are subject to eviction. *Id.* ¶ 36. Defendant has also claimed entitlement to compensation for the Partnership's use of the Parking Facility Properties and has refused to sign deeds acknowledging plaintiffs' interest in the properties unless plaintiffs provide such compensation. *Id.* ¶¶ 39, 40.

3. The statements by defendant's agents constitute exaggerated versions of defendant's view that he is sole titleholder of certain properties pending creation of a new partnership entity to construct and operate a parking facility. These declarations were made in the course of heated negotiations between the Partners. Until they filed this action, plaintiffs gave no indication that they believed these threats to be anything other than mere bluster. Although defendant has not disavowed such statements, he himself has never endorsed the threat of eviction or made such threats himself. Furthermore, defendant now denies that these remarks reflected any intent on his part to encumber or convey the properties. These facts therefore do not constitute a valid basis for an injunction barring defendant from transferring or encumbering the properties in question.

Defendant's efforts to extract financial concessions from plaintiffs also do not justify injunctive relief. Such actions do not demonstrate defendant's desire to prevent the Partnership from using the land in question. Rather, they indicate defendant's interest in reaping greater returns from such use.

4. Under the New Jersey Uniform Partnership Act, N.J.S.A. 42:1-1, *et seq.*, "[a]ll property originally brought into the partnership" is partnership property. N.J.S.A.

42:1-8(1). Property "subsequently acquired by purchase ... on account of the partnership is partnership property." *Id.* Furthermore, "[u]nless the contrary intention appears, property acquired with partnership funds is partnership property." N.J.S.A. 42:1-8(2). *See Fortugno v. Hudson Manure Co.*, 51 N.J.Super. 482, 497, 144 A.2d 207 (App.Div.1958). "[W]hether real estate constitutes an asset of the partnership must be determined by weighing all of the pertinent facts and circumstances." *Kook v. American Surety Co. of New York*, 88 N.J.Super. 43, 56, 210 A.2d 633 (App.Div.1965).

5. Based on the prevailing standards for determining whether property is owned by a partnership, and undisputed facts presented in this case, it is apparent that all of the Parking Facility Properties are property of the Harrah's Associates Partnership.

(a) It is plain that defendant contributed the "Hertz" parcel to the Partnership at the time of its formation. Findings of Fact ¶¶ 24, 42, 43. Accordingly, this portion of the Parking Facility Properties is partnership property. N.J.S.A. 42:1-8(1).

(b) Defendant purchased the other two parcels in question with partnership funds, pursuant to approval from the Partnership Executive Committee, and with the intent to accomplish an objective of the Partnership. Findings of Fact ¶¶ 21–23, 25–28, 42–43. Consequently, these two parcels of land are also property of the Partnership even though the deeds to the properties name defendant as sole titleholder, in his capacity as nominee for the new partnership the Partners have attempted to form. N.J.S.A. 42:1-8(1), (2); *Stark v. Reingold*, 18 N.J. 251, 267, 113 A.2d 679 (1955).

In light of the foregoing, plaintiffs are entitled to a declaration of their partnership interest in the properties in question.

6. Plaintiffs ask the court to order defendant to execute deeds recognizing their interests in the Parking Facility Prop-

erties on two grounds. First, plaintiffs contend defendant has a contractual duty to acknowledge their ownership role. In some circumstances, where a partner has refused to fulfill a contractual obligation to convey an interest in a unique asset to a partnership, a court may require specific performance of the agreement even though the partnership has not yet been formed and may never be formed. *Rabinowitz v. Borish*, 43 F.Supp. 413, 415 (D.N.J.1942). Plaintiffs also urge the court to find that defendant holds the Parking Facility Properties in a constructive trust for the Partnership. A constructive trust may be impressed in appropriate circumstances "[w]henever title to property is acquired by fraud ... or retained in violation of a fiduciary duty." *Hyland v. Simmons*, 152 N.J.Super. 569, 575, 378 A.2d 260 (Ch.Div. 1977). *Accord D'Ippolito v. Castoro*, 51 N.J. 584, 588, 242 A.2d 617 (1968).

7. At this time, there is no merit to plaintiffs' demand for an order altering the deeds to the Parking Facility Properties to acknowledge both Partners' ownership interests therein. With respect to plaintiffs' contract claim, there is nothing in the record indicating defendant's refusal to transfer the properties in question to a new, yet-to-be-formed Parking Facility partnership; nor has he prevented plaintiffs from using the properties or "retained them in violation of a fiduciary duty." On the contrary, the record shows that defendant recognizes that the properties must be transferred to the new partnership entity if the Partners succeed in reaching agreement. Findings of Fact ¶ 42. Furthermore, defendant has represented to the court that he will take no steps inconsistent with the Partners' agreements pending the outcome of negotiations regarding the new partnership. Findings of Fact ¶ 42. Unless and until the Partners' negotiations collapse, the court need not consider requiring the conveyance of the properties in order to reflect plaintiffs' interests.

8. Plaintiffs' remaining request is for the court to declare that each of the Partners' own equal shares in the Parking Facility Properties. The court is unable to discern any basis for granting such equitable relief at this stage. If the Partners are able to reach agreement on terms for formation of a new Parking Facility Partnership, the dispute plaintiffs wish the court to resolve will be moot. Any action the court takes prior to that time might upset the negotiations now underway between the Partners.

9. The court is mindful of the importance of the Parking Facility Properties, both now, and in the foreseeable future, to the Partnership's casino hotel and to the successful continuation of the Partnership. Findings of Fact ¶¶ 30–34. The court is also aware of the importance of adequate parking facilities at the Partnership's casino hotel to the residents of and visitors to Atlantic City. Findings of Fact ¶ 35. Accordingly, should the Partners fail to reach agreement, within a reasonable time, as to the terms for establishment of an entity to construct and operate a Parking Facility, the Partnership and the Atlantic City Community will be faced with serious and irreparable harm.

10. Should the negotiations regarding a Parking Facility Partnership fall apart, plaintiffs ask that the court direct a conveyance of the Parking Facility Properties to the Partnership, and then preside over proceedings to dissolve the Partnership. Plaintiffs' Proposed Findings of Fact and Conclusions of Law at 71–72, 115. Defendant agrees that partition proceedings may be required if plaintiffs insist on claiming anything more than a minority, equitable interest in the properties. Findings of Fact ¶ 39; Defendant's Proposed Findings of Fact and Conclusions of Law at 33.

The remedies favored by the Partners are inappropriate to prevent harm to the Partnership and the Atlantic City Community due to delay in development of a Parking Facility. On the contrary, such measures would only cause further delay. Thus, the court declines the invitation to become involved in dissolution proceedings in this matter. The parties must seek such relief in state court.

11. The court favors an alternative path. If the Partners are unable to reach

agreement, the court will entertain an application by either party, within forty-five days of this decision, for an exercise of its equitable powers. Pursuant thereto, the court will consider ordering such relief as is necessary and appropriate to secure development of a Parking Facility for the Partnership's casino hotel. The court's order may take various forms, including, but not limited to, the appointment of a special master. Fed.R.Civ.P. 53. In that event, the special master would be directed to supervise specific performance of the parties' stated intentions to build new parking accommodations for their Boardwalk facility. To this end, the special master would conduct hearings concerning a plan to construct and operate a parking garage. In order to carry out any plan ultimately adopted by the court, it might be necessary for the court to order conveyance of the land now held by defendant as nominee to an entity empowered to accomplish tasks on behalf of the Partners. The proper form of such an entity would also be a topic to be addressed in hearings before a special master.

## II. USE OF THE NAME "TRUMP"

### A. Introduction

12. Plaintiffs originally sought an injunction against defendant's use of the name "Trump" in the promotion of his new casino hotel under three closely related causes of action: common law service mark and trade name infringement, common law unfair competition, and Federal statutory unfair competition, Lanham Act § 43(a). In the course of proceedings in this matter, plaintiffs have also maintained that the parties' agreements and dealings with one another preclude defendant from using his name in connection with his new gaming facility. Plaintiffs make two claims of this nature. First, they contend that defendant relinquished his rights in his name by failing to reserve such rights anywhere in the Partnership Agreement or related subsequent writings. Second, defendant's efforts to induce plaintiffs to adopt his name as a symbol of the Partnership's casino hotel allegedly estop him from promoting his own casino hotel with similar symbols.

13. Defendant denies that he has violated either his contractual or fiduciary duties to his Partner. Defendant contends that the Partnership Agreement and the law of trademark infringement guarantee his right to compete in his own name. Defendant also maintains that he has rights of publicity in his name. Finally, defendant argues that public confusion regarding the use of his name in the Atlantic City casino industry is not solely attributable to his acts; rather, it also stems from the Partnership's failure to use the name "Trump" in a consistent fashion.

### B. Plaintiffs' Contract Claims

14. It is undisputed that Section 5.1(c) of the Partnership Agreement explicitly (a) reserves to HAC "own[ership] and control of the name and [registered] service mark Harrah's," and (b) grants to the Partnership "the right to use the name 'Harrah's' ... in connection with the name and operation of the [Partnership's casino] Hotel." Findings of Fact ¶ 45(a). It is also uncontested that defendant never insisted on a similar contractual reservation of rights in his name, either in the Partnership Agreement or at any time thereafter, as the Partnership began to feature his name more prominently in promoting its casino hotel. Findings of Fact ¶ 46. On this basis, plaintiffs argue that defendant forfeited his right to use his own name other than in connection with the Partnership's casino hotel.

First, plaintiffs argue that by failing to reserve rights to his name in the Partnership Agreement, defendant bargained away such rights. *See supra*, Findings of Fact ¶¶ 48, 49. Plaintiffs also assert defendant forfeited his rights in September, 1983, when he failed to qualify language in the parties' Letter Agreement which recited HAC's understanding that the Partnership was permitted to "take full advantage" of his name. *Id.* ¶ 55.

15. With respect to plaintiffs' first set of allegations, defendant states that "there was never any doubt" that the Partnership Agreement authorizes both Partners to

start new casino hotels in their own names; if the contract had had any other effect, defendant "would not have gone into the Partnership." Findings of Fact ¶¶ 48, 50. Plaintiffs maintain they would not have approved either agreement if they had known of defendant's views of this nature. *Id.* ¶¶ 49, 56.

16. Neither the Partnership Agreement nor the September, 1983 Letter Agreement states unambiguously what the parties intended as to defendant's right to subsequent use of his name in connection with other enterprises in the casino hotel industry. Consequently, the court is obliged to go beyond the express terms of the parties' writings to discern their meaning. To this end, the court may consider extrinsic evidence of the parties' intentions. *See Ross v. Orr,* 3 N.J. 277, 282, 69 A.2d 730 (1949); *Midland Carpet Corp. v. Franklin Associated Properties,* 90 N.J.Super. 42, 46, 216 A.2d 231 (App.Div.1966). The court is faced with a situation in which contracting parties' expectations differed. In such circumstances,

> the court will substitute for the subjective test of shared expectation an objective test of whether one party should reasonably have known of the other's expectation.

E. Farnsworth, Contracts § 7.16 at 523 (1982).

17. At the time of the signing of the Partnership Agreement, defendant's prior activity in Atlantic City and his practice of associating his name with his major projects gave plaintiffs ample grounds to expect that (a) defendant might at some future time seek to own or operate another casino hotel in Atlantic City, and that (b) defendant would use his name in connection with such an enterprise. Findings of Fact ¶¶ 12, 51. Consequently, it was objectively reasonable for plaintiffs to have known that defendant expected that (a) the Partnership Agreement would have to restrict his right to use his own name explicitly, if at all, and that accordingly, (b) the Partnership Agreement did not restrict his right to use his name in later ventures in the casino industry. By contrast, defendant cannot be charged with knowledge of plaintiffs' understanding that he was required to reserve his rights to future use of his name in a competing facility. In June, 1982, defendant's name had only limited recognition in the casino industry. Meanwhile, plaintiffs were industry leaders with another competing facility in operation in Atlantic City. It was reasonable for defendant to conclude that plaintiffs reserved rights to the "Harrah's" name because of the substantial goodwill already associated with it, and that he was not required to make a similar reservation until his name had developed similar value in the industry. Accordingly, there is no merit to the claim that defendant waived or implicitly bargained away such rights in the Partnership Agreement.

18. There is also no substance to plaintiffs' contract claim based on the September 27, 1983 Letter Agreement. Plaintiffs agreed to use defendant's name more prominently in promoting the Partnership's facility largely because they became convinced that such a move would be profitable. Findings of Fact ¶ 55. Defendant's general reputation had increased considerably since the formation of the Partnership. *Id.* ¶¶ 12, 55. His reputation in the casino industry, however, was still quite modest. Nothing in the record demonstrates that defendant was then more willing to concede exclusive rights to the use of his name than he was at the time of the formation of the Partnership. There was also no more reason in September, 1983 to think that plaintiffs expected him to explicitly reserve such rights.

19. Plaintiffs also urge the court to find that defendant is estopped from using his name in connection with his new casino hotel. *See* N.J.S.A. 42:1–4(a) (West 1940 ed.). Plaintiffs allegedly relied to their detriment on defendant's apparent willingness to lend his name exclusively to the Partners' facility, as expressed in his efforts to persuade plaintiffs to give his name greater prominence in the Partnership's advertising campaigns.

Plaintiffs' estoppel claim is premised on a series of cases which hold that a person

who sells a business bearing his or her name is estopped from opening a competing enterprise, similarly named. *See, e.g., Hanover Manufacturing Co. v. Ed Hanover Trailers, Inc.,* 160 U.S.P.Q. (BNA) 633 (Tex.1968). Such decisions are readily distinguishable from the case at bar. In each instance, the defendant had transferred the goodwill built up in his or her name in connection with a particular business, and then had sought to benefit further from the same goodwill. *See* 160 U.S.P.Q. at 635. As set forth above, Conclusions of Law ¶¶ 17, 18, plaintiffs have failed to show that defendant made any such transfer of exclusive rights in his name to the Partnership. Furthermore, unlike the sale-of-business cases, cited by plaintiffs, this matter involves a defendant who is still active in both enterprises using his name. The court also cannot accept a principal factual contention advanced by plaintiffs in connection with their estoppel claim. It is implausible that HAC and HI, accomplished and experienced gaming entrepreneurs, made repeated concessions to defendant regarding the Partnership's use of his name simply to salve his ego. On the contrary, the record shows that defendant and others gradually convinced plaintiffs that his name offered an effective means for promoting the Partnership's casino hotel. Findings of Fact ¶¶ 53, 55, 60, 62.

In light of the foregoing analysis, the court will deny plaintiffs' estoppel claim.

### C. The Elements of Plaintiffs' Service Mark and Unfair Competition Claims

#### 1. Common Law Service Mark Infringement

■ 20. To establish common law service mark or trade name infringement, plaintiffs must establish that the service marks or trade names are valid and legally protectable, that they are owned by plaintiffs, and that defendant's subsequent use of the same or similar marks is infringing, *i.e.,* likely to create confusion as to the

origin of the goods or services. *Scott Paper Co. v. Scott's Liquid Gold, Inc.,* 589 F.2d 1225, 1228 (3rd Cir.1978); *Estate of Presley v. Russen,* 513 F.Supp. 1339, 1362 (D.N.J.1981). "Actions for trademark [or service mark] infringement serve both to protect the 'right' of the public to be free of confusion and the synonomous right of a trademark [or service mark] owner to control his product's [or service's] reputation." *Estate of Presley v. Russen, supra,* 513 F.Supp. at 1362, following *James Burrough, Ltd. v. Sign of Beefeater, Inc.,* 540 F.2d 266, 274 (7th Cir.1976), *rev'd on retrial on other grounds,* 572 F.2d 574 (7th Cir.1978).[3]

■ 21. The only difference between a trademark and a service mark is that the former is associated with the sale of goods, while the latter concerns cases such as this, which involve the provision of services. *Caesars World, Inc. v. Caesar's Palace,* 490 F.Supp. 818, 822 (D.N.J.1980). A service mark is defined as "a word, name, symbol, device or advertising of services to identify the service of the entity and distinguish them from the services of others." *Estate of Presley v. Russen, supra,* 513 F.Supp. at 1362, *quoting Caesars World, Inc. v. Caesar's Palace, supra,* 490 F.Supp. at 823.

■ 22. In determining whether a valid service mark is protectable under the common law, different standards apply depending on the features of the mark.

Inherently distinctive trademarks or service marks, such as fanciful or arbitrary or non-descriptive, but suggestive, words and symbols, gain protected status upon their first adoption and use; while, non-inherently distinctive marks only achieve protection if the mark is shown to have secondary meaning.

*Estate of Presley v. Russen, supra,* 513 F.Supp. at 1364. *See* 1 McCarthy, Trademarks and Unfair Competition, ("McCarthy"), §§ 15.1, 16.2; *Scott Paper Co. v.*

---

**3.** "The trademark laws exist not to 'protect' trademarks, but to protect the consuming public from confusion, concomitantly protecting the trademark [or service mark] owner's right to a non-confused public." *Id.* 589 F.2d at 1228, *quoting* 540 F.2d at 276.

*Scott's Liquid Gold, Inc., supra,* 589 F.2d at 1228.

23. In the case at bar, the court is faced with service marks based on a surname. Such marks are not inherently distinctive.[4] *Scott Paper Co. v. Scott's Liquid Gold, Inc., supra,* 589 F.2d at 1228; *Blisscraft of Hollywood v. United Plastics Co.,* 294 F.2d 694, 697 (2nd Cir.1961); *Dresser Industries, Inc. v. Heraeus Engelhard Vacuum, Inc.,* 267 F.Supp. 963, 968 (W.D.Pa.1967), *aff'd,* 395 F.2d 457 (3rd Cir.), *cert. denied,* 393 U.S. 934, 89 S.Ct. 293, 21 L.Ed.2d 270 (1968); 1 McCarthy, §§ 13.2, 15.1; 3 R. Callman, Unfair Competition, Trademarks & Monopolies (3d Ed.) § 77.1.

24. "A ... service mark attains secondary meaning if the consuming public has come to recognize the mark not only as an identification of the ... services but as a symbol indicating that the ... services emanate from a single source, even though the identify of that source may in fact be unknown." *Estate of Presley v. Russen, supra,* 513 F.Supp. at 1364. *Accord United States Jaycees v. Philadelphia Jaycees,* 639 F.2d 134, 142 (3rd Cir.1981); *Scott Paper Co. v. Scott's Liquid Gold, Inc.,* 439 F.Supp. 1022, 1034–35 (D.Del.1977), *rev'd on other grounds,* 589 F.2d 1225 (3rd Cir. 1978); 1 McCarthy § 15.2; 3 Callman § 77.1.

25. A determination as to the likelihood of confusion requires the court to weigh a variety of factors, including, but not limited to (a) the strength of the allegedly infringed mark, (b) the degree of similarity between the original mark and the allegedly infringing mark, (c) the intent of the defendant in adopting the allegedly infringed mark, (d) the similarity of products or services involved, and (e) the evidence of actual confusion. *Estate of Presley v. Russen, supra,* 513 F.Supp. at 1366. *See also Q-Tips, Inc. v. Johnson & Johnson,* 206 F.2d 144, 147–48 (3rd Cir.), *cert. denied,* 346 U.S. 867, 74 S.Ct. 106, 98 L.Ed.

377 (1953); *Caesars World, Inc. v. Caesar's Palace, supra,* 490 F.Supp. at 823–24; *Fotomat Corp. v. Drive-Thru, Inc.,* 425 F.Supp. 693, 703 (E.D.Pa.1977); *McNeil Laboratories, Inc. v. American Home Products Corp.,* 416 F.Supp. 804, 806 (D.N. J.1976).

## 2. Common Law Unfair Competition

26. New Jersey common law unfair competition includes, but covers a broader spectrum of behavior than, service mark infringement. *Estate of Presley v. Russen, supra,* 513 F.Supp. at 1372; *Caesars World, Inc. v. Caesar's Palace, supra,* 490 F.Supp. at 828; *Time Mechanisms, Inc. v. Qonaar Corp.,* 422 F.Supp. 905, 915 (D.N.J.1976). When the form of unfair competition involves use of a similar trade name or service mark, the key elements are closely linked. *Estate of Presley v. Russen, supra,* 513 F.Supp. at 1372–73; *Perfectform Corp. v. Perfect Brassiere Co.,* 256 F.2d 736, 741–42 (3d Cir.1958); *Caesars World, Inc. v. Caesar's Palace, supra,* 490 F.Supp. at 828; *Fotomat Corp. v. Photo Drive-Thru, Inc., supra,* 425 F.Supp. at 708–09.

27. The same facts supporting likelihood of confusion in a service mark infringement action will support a suit for unfair competition. *Estate of Presley v. Russen, supra,* 513 F.Supp. at 1373; *Time Mechanisms, Inc. v. Qonaar Corp., supra,* 422 F.Supp. at 915; *American Shops, Inc. v. American Fashion Shops of Journal Square, Inc.,* 13 N.J.Super. 416, 421, 80 A.2d 575 (App.Div.), *cert. denied,* 7 N.J. 576, 83 A.2d 379 (1951). However, there are fewer restrictions for a showing of unfair competition, and more leeway in the exercise of the court's equitable powers. *Estate of Presley v. Russen, supra,* 513 F.Supp. at 1373; *Fotomat Corp. v. Photo Drive-Thru, Inc., supra,* 425 F.Supp. at 709; *American Shops, Inc. v. American Fashion Shops of Journal Square, Inc., supra,* 13 N.J.Super. at 421, 83 A.2d 379.

---

4. The court takes judicial notice of the fact that defendant's last name is also a word commonly associated with card games, in particular, "bridge." Nevertheless, the parties have not argued that this coincidence constitutes a basis for a finding that defendant's name is inherently distinctive; accordingly, the court will treat the name in question as any other surname.

■ 28. "The essence of the law of unfair competition is fair play." *Time Mechanisms, Inc. v. Qonaar Corp., supra,* 422 F.Supp. at 915; *accord Merrell-National Laboratories v. Zenith Laboratories,* 194 U.S.P.Q. (BNA) 157, 159–60 (D.N. J.1977), *aff'd,* 579 F.2d 786 (3rd Cir.1978). Thus, "[i]t is possible to be guilty of unfair competition even when trademark infringement is not present, if use of a similar but noninfringing mark or device is combined with unfair practices in a manner which is likely to deceive purchasers regarding the origin of goods [or services] under all the circumstances." *Estate of Presley v. Russen, supra,* 513 F.Supp. at 1373, *quoting Fotomat Corp. v. Photo Drive-Thru, Inc., supra,* 425 F.Supp. at 709. *Accord SK & F, Co. v. Premo Pharmaceutical Laboratories,* 625 F.2d 1055, 1062–63 (3rd Cir. 1980).

### 3. Lanham Act

■ 29. Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a),[5] is a remedial statute that creates a distinct Federal statutory tort "designed to afford broad protection against various forms of unfair competition and false advertising." *Estate of Presley v. Russen, supra,* 513 F.Supp. at 1376. *See SK & F, Co. v. Premo Pharmaceutical Laboratories, supra,* 625 F.2d at 1065.

■ 30. As a general rule, the same facts indicating a likelihood of confusion as to source or sponsorship of services which would support an action for service mark infringement or common law unfair competition would also support an action for unfair competitive practices under § 43(a). *Estate of Presley v. Russen, supra,* 513 F.Supp. at 1376. *See SK & F, Co. v. Premo Pharmaceutical Laboratories, supra,*

625 F.2d at 1065. The "likely to cause confusion or deceive customers" standard under Section 43(a) is closely analogous to, if not identical with, the "likelihood of confusion" standard applied in service mark or unfair competition actions. *See Estate of Presley v. Russen, supra,* 513 F.Supp. at 1376–77.

■ 31. As for the scope of Section 43(a), the Third Circuit has stated that the statute

> proscribes not only acts that would technically qualify as trademark infringement, but also unfair competitive practices involving actual or potential deception (citations omitted).

*SK & F, Co. v. Premo Pharmaceutical Laboratories, Inc., supra,* 625 F.2d at 1065.

### D. Standing

32. Defendant has raised an initial objection to plaintiffs' standing to assert rights relating to his use of the "Trump" name in connection with the former Hilton property. Standing requires that "the plaintiff has 'alleged such a personal stake in the outcome of the controversy' as to warrant his invocation of federal court jurisdiction and to justify exercise of the court's remedial powerson his behalf." *Estate of Presley v. Russen, supra,* 513 F.Supp. at 1350–51, quoting from *Warth v. Seldin,* 422 U.S. 490, 498–99, 95 S.Ct. 2197, 2204–05, 45 L.Ed.2d 343 (1975). In this regard, Article Three of the United States Constitution requires plaintiffs in federal court to show, at a minimum, "some actual or threatened injury as a result of the putatively illegal conduct of the defendant." *Gladstone Realtors v. Village of*

---

5. Section 43(a) provides:

"(a) Any person who shall affix, apply, or annex, or use in connection with any goods or services, or any container or containers for goods, a false designation of origin, or any false description or representation, including words or other symbols tending falsely to describe or represent the same, and shall cause goods or services to enter into commerce, and any person who shall with knowledge of the falsity of such designation of origin or description or representation cause or procure the same to be transported or used in commerce or deliver the same to any carrier to be transported or used, shall be liable to a civil action by any person doing business in the locality falsely indicated as that of origin or in the region in which said locality is situated, or by any person who believes that he is or is likely to be damaged by the use of any such false description or representation."

*Bellwood,* 441 U.S. 91, 99, 99 S.Ct. 1601, 1607, 60 L.Ed.2d 66 (1979).

33. In the case at bar, plaintiff HAC is a half-owner of the Partnership. HAC is obligated under the Partnership Agreement to fund any cash flow deficiencies until May, 1989 and is required to operate the Partnership facility based on certain performance criteria. HI is the parent of HAC and has given an express payment obligation guarantee for the permanent financing of the Partnership's casino hotel. Plaintiffs are thus directly affected by any losses in the Partnership's business due to defendant's alleged wrongful use of the name "Trump."

34. Additional grounds exist to support plaintiffs' standing to assert its claims of unfair competition. The Partnership Agreement requires the Partners to compete with the Partnership's casino hotel "consistent with their fiduciary obligations as Partners." *See* Findings of Fact ¶ 47. If use of the name and service mark Trump's Castle Hotel & Casino constitutes unfair competition then, *a fortiori*, it is a breach of Trump's fiduciary and contractual duties to plaintiffs.

35. Plaintiffs also have standing to assert their claims under the Lanham Act. Section 43(a) expressly extends standing beyond the trademark owner to "any person who believes that he is or is likely to be damaged" by defendant's conduct. 15 U.S.C. § 1125(a). "Congress has ... given a broad class of suitors injured or likely to be injured by such wrong the right to relief in the federal courts." *L'Aiglon Apparel, Inc. v. Lana Lobell, Inc.,* 214 F.2d 649, 651 (3rd Cir.1954). *Accord Thorn v. Reliance Van Co., Inc.,* 736 F.2d 929, 932 (3rd Cir. 1984). Because of HAC's and HI's rights and obligations under the Partnership Agreement, damage to the business of the casino hotel caused by violations of Section 43(a) will damage both HAC and HI.

### E. Plaintiffs' Service Mark Infringement Claim

#### 1. Validity of the Marks

36. Plaintiffs assert that the terms "Trump Plaza," "Trump Casino Hotel" and "Trump" are valid and protectable service marks. The Partners employed the words "Trump Plaza" as part of the title of their casino hotel from the formation of the Partnership in June, 1982 until February, 1985. Findings of Fact ¶¶ 53, 55, 58, 62. The Partnership adopted "Trump Plaza" as its principal symbol in October, 1984. Findings of Fact ¶ 58. Although "Trump Casino Hotel" succeeded "Trump Plaza" as the title of the Partners' facility in February, 1985, numerous signs and other items in the casino hotel and elsewhere still bear the imprint of two earlier slogans, "Harrah's at Trump Plaza" and "Trump Plaza." Findings of Fact ¶ 66. The term "Trump Casino Hotel" has been employed extensively in advertising purchased by the Partnership since late March, 1985. Findings of Fact ¶ 64. The words "Trump Casino Hotel" form a logo on numerous other items used in the casino hotel. *Id.* In May, 1985, the plaintiffs registered "Trump Casino Hotel" as a service mark of the Partnership, over defendant's objections. The legend "Trump" appears on directional signs for the Partners' facility. *Id.* In addition, the name "Trump" has been the single word common to all of the formulations adopted by plaintiffs.

37. In light of the foregoing, it is plain that the Partnership has used "Trump," "Trump Plaza" and "Trump Casino Hotel" to identify its gaming and lodging services at its Boardwalk facility, and to distinguish such services from those provided at other casino hotels. These facts qualify both terms as valid service marks of the Partnership.

#### 2. Secondary Meaning

38. As set forth above, the plaintiffs' service marks are not inherently distinctive as they consist of or are based on a personal name. Therefore, in order to claim common law rights in the marks, plaintiffs must show that they have acquired secondary meaning.

The existence of secondary meaning is a question of fact as to the state of mind of the consuming public. 1 McCarthy, § 15.10 at 683–84. Although

[i]t is impossible to lay down any generalized rule as to the minimum amount of distinctiveness necessary to achieve secondary meaning in a mark ... the less distinctive the term, the greater the quantity and quality of evidence ... needed to prove some degree of [secondary meaning].

*Id.* at 683. A mark's attainment of secondary meaning may be proved either by direct evidence of the views of consumers or by circumstantial evidence thereof, such as a seller's efforts to reach consumers through advertising. *Id.* at 684–85.

39. The best evidence that a mark has acquired secondary meaning is proof of actual confusion. *See Interpace Corp. v. Lapp, Inc.*, 721 F.2d 460, 462 (3rd Cir. 1983); 1 McCarthy, § 15.3 at 667 ("If there is some customer confusion in fact, then it follows that there must also be some secondary meaning."). In such circumstances,

[s]econdary meaning and likelihood of buyer confusion, although two separate legal issues, will be difficult to distinguish in viewing the evidence. That is, if buyers are confused, then this also means that they have recognized plaintiff's word as a trademark and associated it only with plaintiff.

1 McCarthy, § 15.2 at 666. Accord *Interpace Corp. v. Lapp, Inc., supra*, 721 F.2d at 462. By the same token, "if secondary meaning is proven by other evidence, this does not necessarily mean that confusion is likely." 1 McCarthy, § 15.3 at 667.

#### a. "Trump Plaza"

40. With respect to the "Trump Plaza" mark, plaintiffs have presented no evidence of actual confusion. The Partnership abandoned its "Trump Plaza" advertising campaign and initiated its "Trump Casino Hotel" promotion prior to defendant's acquisition of the Hilton casino hotel on April 20, 1985. Thus, the only proof of actual confusion plaintiffs could conceivably offer would involve customer responses, subsequent to April 20, 1985, to items still in service at the Partnership's facility and which bear the words "Trump Plaza" in some form or another. The record contains no such evidence; rather, plaintiffs' proof of confusion focuses generally on persons mistaking the Partnership's facility with "Trump's Castle Casino Hotel."

41. The numerous affidavits submitted by plaintiffs contain little evidence to support their claim that the term "Trump Plaza" retains secondary meaning. In the first place, the record shows that the Partners gained little publicity from the name "Harrah's Boardwalk at Trump Plaza," as they abandoned it well before the opening of their casino hotel. More importantly, several of plaintiffs' witnesses concede that the term "Harrah's at Trump Plaza" caused confusion as to the source of the services provided at the Partnership's facility. Findings of Fact ¶¶ 53, 59, 60. Many casino customers and numerous others in the Atlantic City area apparently associated the Partners' casino hotel with the ownership of Harrah's Marina facility. *Id.* These problems constituted a major impetus for subsequent name changes at the Partners' facility. *Id.* Plainly, the "Trump Plaza" mark developed customer identification with two different sources: a hybrid entity responsible for the "Trump Plaza" facility and the Harrah's organization.

42. Plaintiffs have submitted some direct evidence that the "Trump Plaza" mark acquired secondary meaning once the Partnership began to use it without reference to the "Harrah's" mark. A December, 1984 customer survey indicated high and increasing awareness of the Partnership's casino hotel. Findings of Fact ¶ 66. Plaintiffs fail to present many details about the design and content of the survey, however; consequently, the court is unable to say that it clearly indicates public association of the "Trump Plaza" mark, then in use, with a single purveyor of gaming and lodging services. *Id.* After all, in December, 1984, numerous aspects of the Partnership's operation still went by the "Harrah's at Trump Plaza" mark, which has been associated with the Harrah's organization.

The record contains significant circumstantial evidence of secondary meaning. Plaintiffs have described the Partnership's substantial expenditures on advertisements

using the "Trump Plaza" mark. Findings of Fact ¶ 64. This campaign ended in January, 1985. Shortly after the Partners decided to employ the slogan "Trump's Casino Hotel," they began to withdraw references to "Trump Plaza." Because of the mark's short life, relatively few examples of it remain today. By contrast, numerous examples of the "Harrah's at Trump Plaza" logo still exist.

43. The weight of the evidence suggests that the mark "Trump Plaza" once acquired limited secondary meaning as a symbol of the Partners' facility in late 1984 and early 1985. The Partnership's heavy advertising budget probably accomplished such a result among some portions of the public despite the presence of references to "Harrah's at Trump Plaza" throughout the establishment. The court has serious doubts as to whether any such secondary meaning exists for the "Trump Plaza" mark today. The media have been barraged with the Partners' promotion of a new name over the last five months. Furthermore, the "Trump Plaza" slogan had a short life of its own, and is still being diluted by prominent references to "Harrah's at Trump Plaza." Any secondary meaning which still exists independent of the Harrah's mark is minimal. Plaintiffs' rights to protect the mark are likewise, at best, quite weak.

**b. "Trump Casino Hotel" and "Trump"**

44. The record contains significant evidence of actual confusion between the Partners' facility and "Trump's Castle Casino Hotel." Findings of Fact ¶ 74. The same evidence indicates that, at least since February, 1985, the terms "Trump" and "Trump Casino Hotel" have some secondary meaning associated with the Partnership's facility.

45. The Partners' use of the name "Trump" in the earlier versions of the title of their casino hotel, prior to February, 1985, suggests that the "Trump" mark has developed secondary meaning superior to that of "Trump Casino Hotel." Nevertheless, plaintiffs have failed to present sufficient evidence to corroborate this inference. The record provides stronger support for

the conclusion that the Partnership's use of the term "Trump Plaza" has associated the name "Trump" with the trade name "Harrah's," which still appears on the Partnership's signs with the "Trump" mark. Accordingly, the court finds that the association of "Trump Plaza" with Harrah's, to the present day, negates the value of any independent secondary meaning for the "Trump" mark which may have arisen prior to February, 1985.

**3. Ownership of the Marks**

46. Defendant challenges plaintiffs' service mark and unfair competition claims, above all, on the grounds that plaintiffs are unable to establish their ownership of rights in his name. In particular, defendant maintains that plaintiffs use his name pursuant to a non-exclusive revocable license which he granted to them. Defendant also identifies several independent grounds for his right to control the commercial use of his name.

The court has previously ruled that no agreement between the parties, either explicit or implicit, guarantees plaintiffs exclusive use of defendant's name. This conclusion necessarily implies that at the outset of the parties' relationship, defendant had the rights to which he now lays claim. Subsequently, the Partnership used defendant's name and built up goodwill therein. Under the common law of trademarks, such activity provides plaintiffs a basis for asserting rights in defendant's name beyond those granted by him.

47. Using a personal name as a service mark transforms the name by giving it a new identity as the symbol of commercial goodwill. One who develops goodwill in a service mark acquires property rights in the mark. *See United States Drug Co. v. Theodore Rectanus Co.*, 248 U.S. 90, 97, 39 S.Ct. 48, 50, 63 L.Ed. 141 (1918) ("property in a trademark ... [consists of] a right appurtenant to an established business or trade in connection with which the mark is employed."). *Accord Family Circle, Inc. v. Family Circle Associates, Inc.*, 332 F.2d 534, 539 (3rd Cir. 1964). Plainly,

a trademark [or service mark] is not property in the ordinary sense, but only a word or symbol indicating the origin of a commercial produce. [However, t]he owner of the mark acquires the right to prevent the goods [or services] to which the mark is applied from being confused with those of others and to prevent his trade from being diverted to competitors through their use of misleading marks. *Industrial Rayon Corp. v. Dutchess Underwear Corp.*, 92 F.2d 33, 35 (2nd Cir. 1937), *cert. denied*, 303 U.S. 640, 58 S.Ct. 610, 82 L.Ed. 1100 (1938) (per J. Learned Hand). *Accord Dresser Industries, Inc. v. Heraeus Engelhard Vacuum, Inc.*, 395 F.2d 457, 464 (3rd Cir.), *cert. denied*, 393 U.S. 934, 89 S.Ct. 293, 21 L.Ed.2d 270 (1968).

48. The special nature of property rights in service marks serves as an answer to several of defendant's objections to the notion that the Partnership has rights in his name independent of his consent. For instance, defendant argues that he did not contribute his name as partnership capital upon formation of Harrah's Associates. Defendant's Brief in Opposition at 9. Defendant also states that he used his name to promote other of his own projects prior to its use by the Partnership. *Id.* at 11. Both assertions are true, but irrelevant. The Partnership's development of goodwill in defendant's name associated with casino hotel services created new rights in continued use of the name. It remains for the court to determine however, whether such rights are so strong as to guarantee exclusive use of defendant's name.

Defendant claims elsewhere that the absence of a clause in the Partners' agreement prohibiting competition by a Partner with the Partnership in his own name implies that such activity is permitted by the agreement. Defendant's Proposed Findings of Fact and Conclusions of Law at 27. There is considerable force to this argument. Nevertheless, conceding such an interpretation to be valid does not change the fact that the common law of service marks and unfair competition constitutes an independent source of limitation on defendant's right to use his name, once he has permit-

ted a commercial entity to develop goodwill in it.

49. In order to rebut the special claims of right advanced by plaintiffs, defendant identifies superior rights to compete in his own name based on (a) the "freedom of competition" clause in the Partnership Agreement, (b) a common law presumption against loss of rights in a personal name, and (c) common law rights of publicity.

Section 5.6 of the Partners' Agreement does not guarantee defendant an unlimited right to compete against the Partnership in his own name. Although this passage of the parties' contract contains broad pro-competitive language, it also declares that any competitive enterprise by the Partners shall be conducted in a manner "consistent with their fiduciary obligations as Partners." Findings of Fact ¶ 47. If the court determines that plaintiffs have satisfied all the elements of their service mark or unfair competition claims, such a finding would imply that defendant is competing in a manner contrary to the Partnership Agreement. In order to satisfy Section 5.6 of the agreement, defendant must fulfill his duty to respect the goodwill built up by the Partnership in its service marks. In light of the Partners' explicit reference to fiduciary duty in the competition clause, defendant's assertion that the parties are free to bargain away certain aspects of their ordinary fiduciary obligations is off the mark. *See* Defendant's Brief in Opposition at 6–8.

■ 50. It is well established that there no longer exists any absolute right to use one's own name for commercial purposes. *Taylor Wine Co. v. Bully Hill Vineyards, Inc.*, 569 F.2d 731, 734 (2nd Cir.1978); *John R. Thompson v. Holloway*, 366 F.2d 108, 113 (5th Cir.1966); *Caesars World, Inc. v. Caesar's Palace*, 490 F.Supp. 818, 826 (D.N.J.1980); 1 McCarthy, § 13.3. "Once an individual's name has acquired a secondary meaning in the market place, a later competitor who seeks to use the same or similar name must take 'reasonable precautions to prevent [customer confusion].'" *Taylor Wine Co. v. Bully*

*Hill Vineyards, Inc., supra, quoting L.E. Waterman Co. v. Modern Pen Co.,* 235 U.S. 88, 94, 35 S.Ct. 91, 92, 59 L.Ed. 142 (1914). *Accord John R. Thompson v. Holloway, supra; David B. Findlay, Inc. v. Findlay,* 18 N.Y.2d 12, 271 N.Y.S.2d 652, 218 N.E.2d 531 (1966), *remittitur amd,* 18 N.Y.2d 676, 273 N.Y.S.2d 422, 219 N.E.2d 872, *cert denied,* 385 U.S. 930, 87 S.Ct. 289, 17 L.Ed.2d 212 (1966).

51. The courts remain sympathetic to defendants' wishes to use their own names in the conduct of their businesses. After all, to bar anyone from using his family name is to

> take away his identity: without it he cannot make known who he is to those who may wish to deal with him; and that is so grievous an injury that courts will avoid imposing it, if it possibly can.

*Taylor Wine Co. v. Bully Hill Vineyards, Inc., supra,* 569 F.2d at 735, *quoting Societe Vinicole de Champagne v. Mumm,* 143 F.2d 240, 241 (2nd Cir.1944). *See also International Election Systems Corp. v. Shoup,* 452 F.Supp. 684, 713 (E.D.Pa.1978). The court's task is to weigh this interest against the countervailing interests of the public, in avoiding confusion, and of the senior user of the mark (the Partnership), in preventing dilution of its goodwill in the mark. *Taylor Wine Co. v. Bully Hill Vineyards, Inc., supra,* 569 F.2d at 736. The relative strength of these interests determines what relief, if any, is appropriate. *Id. See International Election Systems Corp. v. Shoup, supra;* 1 McCarthy, § 13.3 at 588–95. *But cf. A.W. Cox Dept. Store v. Cox's Inc.,* 159 W.Va. 306, 221 S.E.2d 539, 545 (1976) (favoring absolute injunctions in order to prevent confusion).

52. The common law "right of publicity" has "come to signify the rights of an individual, especially a public figure or a celebrity, to control the commercial value and exploitation of his name and picture or likeness and to prevent others from unfairly appropriating this value for their commercial benefit." *Estate of Presley v. Russen, supra,* 513 F.Supp. at 1353. *See Zacchini v. Scrips-Howard Broadcasting Co.,* 433 U.S. 562, 575–78, 97 S.Ct. 2849, 2857–59, 53 L.Ed.2d 965 (1977); *Canessa v. J.I.*

*Kislak, Inc.,* 97 N.J.Super. 327, 335–52, 235 A.2d 62 (App.Div.1967). The record contains no evidence to the effect that plaintiffs have acted unfairly to appropriate commercial benefit from defendant's name. On the contrary, defendant exerted great efforts to convince plaintiffs to associate his name with the Partnership's casino hotel. The foreseeable result of such promotional efforts was the development of goodwill in defendant's name in connection with the Partners' facility. In agreeing to lend his name for use as the Partners' service marks, defendant ran the risk that the Partnership might develop rights to use his name, and further, that such rights might become so strong as to justify exclusion of all others, including defendant himself, from using confusingly similar marks. Accordingly, defendant has no basis for claiming that the Partnership's use of his name constitutes an invasion, tortious or otherwise, of his right to publicity. As the court has previously observed however, defendant's desire to use his name in his commercial ventures, and his past practice of doing so, are factors to be weighed in deciding what relief, if any, may be appropriate.

### 4. Likelihood of Confusion

#### a. Similarity of Services and Markets Served

53. It is undisputed that the casino hotel services provided by the Partners' and defendant's respective facilities are virtually identical. In fact, state regulations require that all casino gaming operators provide certain wagering and lodging services. Findings of Fact ¶ 75. The record also shows that the "Trump Casino Hotel" and "Trump's Castle" operate within essentially the same "trade channels," employ similar "manners of marketing" and appeal to roughly the same pool of potential customers and employees. *Id. See also Estate of Presley v. Russen, supra,* 513 F.Supp. at 1366. In this respect at least, the evidence indicates that there is a substantial likelihood that defendant's use of his name in promoting his new casino hotel will cause some confusion in the minds of the public.

### b. Intent of the Defendant

54. Adoption of a service mark with the intent to obtain unfair commercial advantage constitutes strong evidence of a likelihood of confusion. *Amstar Corp. v. Domino's Pizza, Inc.*, 615 F.2d 252, 263 (5th Cir.); *cert. denied*, 449 U.S. 899, 101 S.Ct. 268, 66 L.Ed.2d 129 (1980); *Estate of Presley v. Russen, supra*, 513 F.Supp. at 1368; *John Wright, Inc. v. Casper Corp.*, 419 F.Supp. 292, 320 (E.D.Pa.1976). Plaintiffs allege that defendant's motivation in choosing to associate his name with his new casino hotel was to exploit the goodwill previously built up in the "Trump" name by the Partnership in connection with its facility.

55. The record reveals a sharp dispute as to the facts relevant to defendant's decision to use his own name in connection with his new casino hotel. Plaintiffs argue that defendant hoped to benefit from the Partnership's advertising, and that he showed his bad faith by concealing his decision to use his name. Findings of Fact ¶¶ 69, 71.

56. Plaintiffs have failed to come forward with persuasive evidence of bad faith on defendant's part. While the record supports the claim that defendant knew his choice of names for the "Castle Casino" might cause confusion, it does not sustain the charge that defendant decided to use his name for that reason, in order to exploit the Partnership's goodwill in the "Trump" name. Findings of Fact ¶¶ 72, 73. Nor is there substantial evidence that defendant sought to deceive plaintiffs as to his intentions. *Id.* ¶ 70. Defendant had several good reasons to use his own name which have nothing to do with taking unfair commercial advantage of the Partnership's previous promotional efforts. *Id.* ¶ 72.

### c. Similarity of the Marks

57. The greater the similarity between the allegedly infringed and infringing marks, the greater the likelihood of confusion. *Exxon Corp. v. Texas Motor Exchange of Houston*, 628 F.2d 500, 505 (5th Cir.1980); *Estate of Presley v. Russen, supra*, 513 F.Supp. at 1367.

58. The three service marks plaintiffs seek to protect are substantially similar to the marks employed by defendant at his new casino hotel. In particular, all of the marks in question are derivatives of the name "Trump." The difference between the Partnership's terms "Trump" and "Trump Casino Hotel" and the possessive form adopted by defendant, "Trump's Castle ...," is significant, but minor. The public is not likely to be able to distinguish between the marks solely on this basis. A more pronounced distinction exists between the terms "Trump Plaza," which refers to an actual place, and the defendant's mark, which denotes a particular person's fanciful commercial slogan. While such a difference provides consumers with some basis for comparison, it is insufficient to assure the absence of public confusion between the two facilities.

### d. Strength of the Marks

59. The strength of a service mark is closely related to the degree of secondary meaning associated with a mark. "The term 'strength' as applied to trademarks refers to the distinctiveness of the mark, or more precisely, its tendency to identify the goods sold under the mark as emanating from a particular, although possibly anonymous source." *McGregor-Doniger, Inc. v. Drizzle, Inc.*, 599 F.2d 1126, 1131 (2nd Cir.1979). *Accord Kinark Corp. v. Camelot, Inc.*, 548 F.Supp. 429, 447–48 (D.N.J.1982); *Estate of Presley v. Russen, supra*, 513 F.Supp. at 1367. The strength of a mark is a crucial factor in determining the scope of protection it should be afforded. *Amstar Corp. v. Domino's Pizza, Inc., supra*, 615 F.2d at 259; *Kinark Corp. v. Camelot, Inc., supra*, 548 F.Supp. at 447–48. The stronger the mark, the broader the range of protection given by the courts. *Family Circle, Inc. v. Family Circle Associates, Inc., supra*, 332 F.2d at 540; *Estate of Presley v. Russen, supra*, 513 F.Supp. at 1366–67.

60. Since December, 1984, Harrah's Associates has expended great sums of money to promote the "Trump" name, in each of two forms. The Partners have conducted major publicity campaigns in the print media, on television, and through special

events. Findings of Fact ¶¶ 63, 64. As a result, recognition of the "Trump" name in connection with gambling is high in the markets for casino customers and employees. *Id.* ¶ 66. It is also true that since the opening of the facility on the Boardwalk, the Prtnership has made substantial and continuous use of the "Harrah's at Trump Plaza" logo in the casino hotel itself and at various locations in the Atlantic City area. There can be no doubt that the prominent presence of references to "Harrah's" at the Partners' facility seriously dilutes the strength of the Partnership's service marks based on the "Trump" name.

61. In light of the foregoing, the court concludes that the impression created by the Partnership's marks is greater the more distant an individual is from, and the less familiar a person is with, the Partnership's facility. For a potential customer or employee, initial exposure to the Partnership's services is likely to occur through some form of advertising; based on such exposure, a person is likely to identify the source of the services portrayed as "Trump." As an applicant or visitor approaches the Partners' establishment for the first time however, he or she spots one of several large signs which not only mentions but features the name "Harrah's." A closer inspection of the facilities will inevitably reveal numerous other equally powerful indications that the source of the services offered is something other than just "Trump." The more one knows about the "Trump Casino Hotel," the less one is likely to identify, as the source of the services available there, the very same source suggested by the bulk of the Partners' advertising. Thus, the Partnership's marks using the "Trump" name only suggest a single source of services among persons with a relatively weak image of the nature of those services.

62. The record indicates that "Trump Plaza" is a very weak service mark. Plaintiffs discontinued use of the term as the title of their facility in February, 1985, after just four months. They have made little use of the mark since then. "Trump Plaza" also continues to be closely associat-ed with "Harrah's" in the slogan "Harrah's at Trump Plaza."

63. The evidence before the court demonstrates that associations with the Partnership's two other marks vary dramatically among different segments of the public. A major portion thereof, including most of those relatively familiar with the facility, have been exposed to mixed signals as to the source of the services offered there. For these people, therefore, the two marks are quite weak. Persons less familiar with the Partnership's facility receive a more consistent message from the same two service marks. The "Trump" marks are also relatively weak for such persons, however, as their views of services at the "Trump Casino Hotel" are typically based on advertisements alone, and not on actual use of such services.

**e. Evidence of Actual Confusion**

■ 64. Actual confusion is not necessary to a finding of likelihood of confusion. *Amstar Corp. v. Domino's Pizza, Inc., supra*, 615 F.2d at 263; *Family Circle, Inc. v. Family Circle Associates, Inc., supra*, 332 F.2d at 539; *Estate of Presley v. Russen, supra*, 513 F.Supp. at 1370; *Caesars World, Inc. v. Caesar's Palace*, 490 F.Supp. at 823; *Fotomat Corp. v. Photo Drive-Thru, Inc., supra*, 425 F.Supp. at 703; *Time Mechanisms, Inc. v. Qonaar Corp., supra* 422 F.Supp. at 914.

65. The court has previously noted that the record is barren of evidence of actual confusion of the "Trump Plaza" mark with the "Trump's Castle Casino Hotel" mark. Conclusions of Law ¶ 40.

66. The court concluded earlier that there is significant evidence in the record of actual confusion between the Partnership's casino hotel and defendant's casino hotel. Findings of Fact ¶ 74 Conclusions of Law ¶ 44. The same evidence indicates actual confusion of the "Trump" and "Trump Casino Hotel" marks with the "Trump's Castle Casino Hotel" mark.

**f. Likelihood of Confusion:
Conclusion**

■ 67. In determining the existence of a likelihood of confusion, the court must

look through "the eyes of 'ordinary purchasers, buying with ordinary caution,' *McLean v. Fleming,* 96 U.S. 245, 24 L.Ed. 828 (1878), including people whose purchases are motivated by appearance and general impressions, *Dresser Industries, Inc. v. Heraeus Engelhard Vacuum, Inc.,* 395 F.2d 457, 462 (3d Cir.1968), *cert. denied,* 393 U.S. 934, 89 S.Ct. 293, 21 L.Ed.2d 270 (1968)." *Fotomat Corp. v. Photo Drive-Thru, Inc., supra,* 425 F.Supp. at 703. *Accord Estate of Presley v. Russen, supra,* 513 F.Supp. at 1370–71.

68. There is no substantial likelihood of confusion between the "Trump Plaza" mark and defendant's "Trump Castle Casino Hotel" mark. Virtually all of the relevant factors support such a conclusion. First, plaintiffs have failed to show any actual confusion with the "Trump Plaza" mark. Conclusions of Law ¶¶ 40, 65. Second, at this point, the term "Trump Plaza" is a weak service mark with only minimal secondary meaning, if any. *Id.* at ¶¶ 40–43, 62. Third, to a limited extent, the two marks are dissimilar. *Id.* ¶ 58. Finally, plaintiffs have failed to make any showing of intent on defendant's part to reap the benefits of whatever goodwill is still associated with the "Trump Plaza" mark. *Id.* ¶¶ 54–56. The fact that defendant's new casino hotel is in direct competition with the Partnership's facility is insufficient, on its own, or in combination with any other evidence in the record, to demonstrate a likelihood of confusion as to the "Trump Plaza" mark.

69. There is substantial evidence in the record of actual confusion between the two casino hotels associated with the name "Trump." Conclusions of Law ¶¶ 44, 64. In light of this fact, the court is compelled to find that there is a likelihood of confusion between the Partnership's two other service marks and defendant's service mark.

**5. Appropriate Relief**

70. The court's analysis above renders plainly inappropriate any injunctive relief as to the Partnership's "Trump Plaza" service mark; a closer question is presented concerning its two other service marks.

One way or another, plaintiffs have satisfied each of the elements of a cause of action for infringement of these marks. Having said this however, the court is not through with its responsibility as an equitable tribunal. Rather, it is now incumbent on the court to weigh the special circumstances presented in this case in order to determine whether the injunctive relief requested by plaintiffs is merited. *See Scott Paper Co. v. Scott's Liquid Gold, Inc., supra,* 589 F.2d at 1231; *Dresser Industries, Inc. v. Heraeus Engelhard Vacuum, Inc., supra,* 395 F.2d at 461. In particular, the court must weigh the public interest in avoidance of confusion, plaintiffs interest in undiluted use of its service marks, and defendant's unimpeded use of his name. Conclusions of Law ¶ 51.

71. This matter does not present a compelling case for an award of injunctive relief. In the first place, defendant's practice of using his name in connection with his business projects constitutes a strong reason for the court to defer to the traditional reluctance of the courts to exclude an individual from using his name for commercial purposes. Second, some sectors of the public have come to associate defendant's name with high quality services; thus, allowing defendant to use his name would also serve a limited public purpose, by providing relevant information to consumers.

72. Plaintiffs, meanwhile, have failed to present strong grounds for issuance of an injunction. Although there is evidence of actual confusion among members of the public, there is also considerable evidence that plaintiffs' service marks are weak. Indeed, the very weakness of plaintiffs' marks helps to explain the extent of the confusion which exists. As a prominent commentator has noted:

> The weaker the mark, the greater the likelihood of confusion, but the relatively more limited the protection available; the stronger the mark, and, therefore, the less likelihood of confusion, the more solicitous is the court to afford it protection against similar marks.

3 Callman, § 82.1(i) at 758–59 (1969 ed.). *See Caesars World, Inc. v. Caesar's Palace, supra,* 490 F.Supp. at 824–25.

73. The confusion revealed in this case, furthermore, has been invited and exacerbated by plaintiffs themselves. The court has found that the parties' contract does not specifically prevent the kind of competition in which defendant has engaged. While plaintiffs saw fit to explicitly reserve their own rights to control use of the Harrah's name, they did not demand any authority to regulate defendant's use of his own name. Plaintiffs neglected to insist on provisions regulating use of defendant's name in the casino industry, even as they gradually agreed to make "Trump" the "centerpiece" of their promotional efforts. Finally, whatever confusion the defendant has engendered among customers and others has simply compounded the public bewilderment caused by the Partnership's continued use, throughout its facility, of references to "Harrah's." Under the circumstances presented in this case, the common law of trademark infringement does not support an absolute injunction against defendant's continued use of his name in connection with his new casino hotel.

74. In many instances in which two competitors are using the same name as a service mark, the courts have required the second party to use the mark to add language to its mark further distinguishing its services from those of the plaintiffs. *See* 1 McCarthy, *supra,* § 13.3 at 590–93; § 23.-15 at 90–93. Such modified injunctive relief is unnecessary in the case at bar. Defendant's use of the name "Trump" is *already* different from the Partners' service marks in that defendant uses his name (a) in the possessive form and (b) in combination with a fanciful descriptive term: "Castle."

Accordingly, plaintiffs' claim for injunctive relief under the common law of trademark will be denied in all respects.

### F. Plaintiffs' Common Law Unfair Competition and Lanham Act Claims

75. The court previously noted that in some circumstances, relief may be appropriate under the common law of unfair competition or the Lanham Act based on facts which do not justify an award under the common law of service mark infringement. Conclusions of Law ¶¶ 27, 28, 31. The court will now proceed to consider plaintiffs' remaining claims accordingly.

76. The essence of the plaintiffs' state law claim is that defendant's infringing behavior, while not so severe as to merit relief as such, justifies relief nevertheless because it has been "combined with unfair practices in a manner which is likely to deceive purchasers." Conclusions of Law ¶ 28. In cases such as this, the courts of New Jersey have defined unfair competition, other than trade mark infringement, as the fraudulent marketing of services as those of another. *See SK & F, Co. v. Premo Pharmaceutical Laboratories, Inc., supra,* 625 F.2d at 1062, *citing* cases following Restatement of Torts § 711 (1938). *See also Perfectform Corp. v. Perfect Brassiere Co., supra,* 256 F.2d at 741–42. Plaintiffs' Lanham Act claim is that defendant has engaged in "unfair competitive practices involving actual or potential deception" of the public. Conclusions of Law ¶ 31. This federal cause of action is not significantly different from plaintiffs' state law unfair competition claim. *See SK & F, Co. v. Premo Pharmaceutical Laboratories, Inc., supra,* 625 F.2d at 1065.

77. The court has previously concluded that defendant did not act in bad faith or with intent to exploit plaintiffs' goodwill in choosing to use his own name to promote his new casino hotel. Findings of Fact ¶¶ 70, 72, 73. Plaintiffs have also failed to present any evidence of fraudulent competitive practices by defendant. Defendant's marketing strategy constitutes a setback for the Partnership's goal of establishing a unique identity in Atlantic City. Defendant's course of conduct has also caused his Partners to question his loyalty to their joint venture. However ill-advised defendant's actions may be in these respects, they do not amount to unfair competition. Accordingly, both claims will be dismissed insofar as they seek injunctive relief.

**CONCLUSION**

78. Plaintiffs' application for an order enjoining defendant from using his name in connection with the promotion and operation of his new casino hotel is denied. Plaintiffs have also failed to carry their burden to show that they are entitled to (a) an order barring defendant from conveying, encumbering or otherwise taking steps adverse to their interests in the Parking Facility Properties, or (b) an order directing defendant to convey title to such properties to the Partnership, or to some other partnership in which both Partners have equal interests. Accordingly, plaintiffs' requests therefor are denied. Plaintiffs' petition for declaratory relief is granted insofar as the court finds that (a) defendant acquired and holds title to the Parking Facility Properties as nominee for a partnership to be formed by the parties to construct and manage a new Parking Facility, and that (b) the Parking Facility Properties constitute property of the parties' existing Partnership, Harrah's Associates.

79. The record demonstrates that the Partnership and the Atlantic City Community will be subject to serious and irreparable harm if within the near future, the Partners are unable to consummate their agreement to form a new partnership to construct and manage a parking garage for their casino hotel. Accordingly, if the parties fail to agree on terms for such a partnership entity and decline to seek dissolution of the Partnership, the court will entertain an application from either party, within forty-five days of the entry of this order, to fashion such relief as is necessary and appropriate to develop a new Parking Facility. Appropriate relief may take various forms, including, but not limited to, appointment of a special master to conduct hearings and to establish a plan for construction of the Parking Facility.

**ORDER**

This matter having come before the court on the 28th day of June, 1985; and

The court having considered the submissions and arguments of the parties pursuant to plaintiffs' application for preliminary injunctive and declaratory relief; and

The court having determined that a trial on the merits should be advanced and consolidated with the aforesaid hearing, pursuant to Fed.R.Civ.P. 65(a)(2); and

For the reasons stated in the court's Findings of Fact and Conclusions of Law filed this date,

It is on this 23rd day of September, 1985, hereby ORDERED that:

1. Plaintiffs' application for an order enjoining defendant from using his name in connection with the promotion and operation of his new Atlantic City casino hotel is DENIED;

2. Plaintiffs' application for an order enjoining defendant from conveying, encumbering or otherwise taking steps adverse to plaintiffs' interest in properties adjacent to the "Trump Casino Hotel" which are designated as the site for a new parking facility ("the Parking Facility Properties") is DENIED;

3. Plaintiffs' application for an order directing defendant to convey title to the Parking Facility Properties to "Harrah's Associates" or to some other partnership in which plaintiffs and defendant have equal interests is DENIED;

4. Plaintiffs' application for declaratory relief is GRANTED, insofar as the court finds that:

(a) defendant acquired and holds title to the Parking Facility Properties as nominee for a partnership to be formed by the parties to construct and manage a Parking Facility; and that

(b) the Parking Facility Properties constitute property of Harrah's Associates; and

5. Should the parties be unable to agree on terms for an entity to construct and manage a new Parking Facility, the court will entertain an application from either party, within forty-five (45) days of the entry of this order, for such relief as may

be necessary and appropriate to accomplish this objective.

No costs.